In re AFTER SIX, INCORPORATED (jointly administered with After Six Holdings, Inc. and After Six of Delaware, Inc.), Debtor.

Bankruptcy No. 93–11150S.

United States Bankruptcy Court, E.D. Pennsylvania.

June 11, 1993.

---

Neal D. Colton, Joel H. Levitin, Dechert Price & Rhoads, Philadelphia, PA, for debtor.

Marvin Krasny, Liza Leidner, Wolf, Block, Schorr and Solis–Cohen, Philadelphia, PA, for Official Committee of Unsecured Creditors.

Robert A. Kargen, Lesser & Kaplin, P.C., Blue Bell, PA, for AS Leasing, Inc.

John F. Gough, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, for Genesco, Inc.

William M. Lashner, Lashner & Lashner, and Bernard N. Katz, Meranze & Katz, Philadelphia, PA, co-counsel for Unions.

Alan Markovitz, Silberman, Markovitz & Raslavich, Philadelphia, PA, for Pension Fund.

Kevin Miller, Berlack, Israele & Liberman, New York City, for Unofficial Bondholders' Committee.

Alexander N. Rubin, Leslie Baskin, Rubin, Quinn, Moss & Patterson, Philadelphia, PA, for CIT Corp.

Bruce Z. Zivian, Fitzpatrick Law Offices, Chicago, IL, for Park Avenue Formals, Inc.

Richard D. Gorelsck, Morgan, Lewis & Bockius, Philadelphia, PA, for Jordan/Silverberg, Inc.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA, U.S. Trustee.

## MEMORANDUM AND ORDER

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

This court is presented with the issue of whether it ought to approve, pursuant to 11 U.S.C. § 363(b), a sale of most of the assets of the AFTER SIX, INC. ("the Debtor"), a former manufacturer of formal wear which has recently ceased doing business due to large economic losses, to AS Licensing Corp. ("AS"), the highest bidder at an auction sale, as urged by the Debtor; or to Genesco, Inc. ("Genesco"), which has submitted a lower bid than AS but offers a prospect of employment to the Debtor's former union-affiliated employees and whose bid is supported by the Official Committee of Unsecured Creditors of the Debtor ("the Committee"). With a heavy heart, this court is compelled to conclude that, given the present state of this case, it must enter a revised form of the Debtor's proposed Order authorizing the sale to AS.

### B. HISTORY OF THE MATTER

The instant voluntary Chapter 11 bankruptcy case was filed on February 26, 1993. It represented the aftermath of a vigorous effort by the Amalgamated Clothing and Textile Workers Unions ("the Unions") to prevent the sale of the Debtor's assets to corporate entities controlled by one Charles Ezrine, whom the Unions believed intended to close the Debtor's local plant and relocate its manufacturing operations in another distant location inside (or outside) of the United States, thus destroying its members' jobs. The Unions' efforts in summer, 1992, to enjoin the sale were rejected by the district court. *See Philadelphia Joint Bd. Amalgamated Clothing & Textile Workers Union v. After Six, Inc.,* 1992 WL 202170 and 1992 WL 202166

(E.D.Pa.Decision and Memorandum and Order, August 6, 1992). Several union members employed by the Debtor then filed an involuntary bankruptcy petition against the Debtor, apparently as another vehicle to try to impede this sale, which this court promptly dismissed on the ground that the petitioners failed to prove that the Debtor was at that time not generally paying its debts as they became due. *In re After Six, Inc.*, Bankr, No. 92–14814S (Bankr.E.D.Pa. August 13, 1992). However, after the path of a sale to Ezrine-controlled entities was thus cleared, the sale, fortuitously from the Unions' point of view, fell through. Victor Ameye, the Debtor's chief financial officer, testified at the hearing of June 3, 1993, on the Debtor's instant § 363(b) motion that the primary stumbling block was Ezrine's loss of funding due to pressure from the Unions. There seems to have been some other causes, because the Debtor obtained a favorable court decision, apparently as to liability only, on its counterclaim in a lawsuit brought against it for breach of the sale contract by an Ezrine-controlled entity identified as "Aetna Shirt," based upon breaches of Aetna Shirt's agreement not to hire certain key employees of the Debtor.[1]

Unfortunately, the effects of the Unions' initial victory to block a sale of the Debtor's assets which would eliminate its members' jobs were short-lived, as the Debtor could not afford to continue its operations; filed the instant voluntary case; shortly before and after the filing, laid off almost all of its labor force, which included at least 300 union members; and indicated that it would proceed to liquidate its assets.

On March 30, 1993, the Debtor filed a motion seeking permission, under § 363(b), to sell all of its assets to Park Avenue Formal Wear, Inc., another Ezrine-controlled entity. The sale agreement, which included the Debtor's agreement to dismiss its claims against Aetna Shirt, contemplated a total payment to the Debtor of $6,590,-000. After a hearing on April 14, 1993, at which the Committee and the Unions vigorously opposed the effort of the Debtor to

tie the sale process to the resolution of the Aetna Shirt litigation, the Debtor agreed to withdraw that motion and establish a new, open bidding process. The ultimate result was our entry of an Order of April 16, 1993, establishing a sale process which would lead to an open-bid, non-absolute auction sale of most of the Debtor's assets on May 19, 1993.

While the Debtor and the Committee, which included the Unions and a Union pension fund, public bondholders, and large trade creditors as members, supported the entry of the April 16, 1993, Order, the Unions dissented on the ground that the Order failed to assure that the purchaser was alleged to honor its collective bargaining agreements with the Debtor.

By agreement of all parties, the Debtor, and the Committee, as an intervenor-plaintiff, filed an adversary proceeding (Adv. No. 93–0339S) against the Unions to determine whether the Debtor could sell its assets free and clear of the Unions' claims that the auction sale of May 19, 1993, could not be made free and clear of its rights under the collective bargaining agreement. After a trial of May 12, 1993, this court entered judgment for the Plaintiffs in that proceeding, holding that the Debtor could proceed to sell its assets free and clear of liens and encumbrances pursuant to our Order of April 16, 1993. We reasoned as follows: (1) Since that proceeding was core, pursuant to 28 U.S.C. § 157(b)(2)(N), and involved interpretations of 11 U.S.C. §§ 363 and 1113 of the Bankruptcy Code, the issue of the perpetuation of the collective bargaining agreement should not be deferred to arbitration; and (2) the collective bargaining agreements did not, in our opinion, provide that every successor to the Debtor was bound thereto.

At the May 19, 1993, auction, AS and Genesco emerged as the highest competitive bidders. When voicing its final bid of $5 million, Genesco announced that it was making a commitment to attempt to hire the Debtor's former union employees at the plant in Allentown, PA, as well as to ad-

---

1. The pleadings in and status of this case were not made part of this record, and are not totally clear to this court. This recitation is therefore incomplete and could be somewhat inaccurate.

vancing $100,000 to fund the Aetna Shirt litigation and agreeing to take over the Debtor's accounts receivable collections for a fifteen (15%) percent commission charge.

AS objected to Genesco's efforts to add non-monetary factors into the bidding process. However, recognizing that Genesco's offer of non-monetary factors might influence the receptivity of the interested parties and the court in choosing the successful offer, AS not only bid $5.15 million, but thereafter increased its bid, despite the absence of a further, higher bid from Genesco, to, first $5.5 million, and, then, to $7.1 million. It also agreed to assist the Debtor in collecting its receivables at no cost whatsoever. At the hearing of June 3, 1993, it clarified this term by offering the Debtor the availability, at its option, to employ a liquidator who would charge only eight (8%) percent of collections made as his fee. The court then requested the Debtor to advise the interested parties as to which bid it wished to accept by May 21, 1993, and scheduled a hearing to determine whether the court would approve the sale to the selected bidder on May 27, 1993.

On May 27, 1993, the Committee, the Union, and Genesco requested that the hearing be continued to allow the Union pension fund to resolve, through arbitration, the issue of whether it would agree to withdraw its claim of about $5.5 million against the Debtor on the condition that Genesco's bid were accepted. The Union also agreed, at that time, to waive its own claim of about $700,000 if Genesco's bid were successful. The court agreed to one final continuance of the hearing until June 3, 1993.

After some deliberations on June 3, 1993, in light of an arbitrator's decision the night before conditionally allowing the waiver of pension fund's claim, the administrator of the pension fund testified that the conditions for the waiver had been met. Testimony at the hearing of June 3, 1993, was initially adduced from Ameye, who stated that, in light of a projected dividend of less than twenty (20%) percent to unsecured creditors, the waivers of the claims of the Union and the pension fund enhanced Genesco's bid by no more than $1.2 million, rendering AS's bid nevertheless easily the higher and preferred bid. Ameye discounted the significance of Genesco's offer of future employment to the Debtor's ex-employees as too contingent to be meaningful. He also contended that the Debtor would vigorously prosecute the Aetna Shirt case without Genesco's proffered advance even if AS were the successful bidder, and he discounted any relative benefit of Genesco's offer to help collect the Debtor's receivables over that proposed by AS.

Also testifying on June 3, 1993, were (1) John Fox, the Union President, who vigorously supported Genesco's offer and promised likely Union transportation assistance for workers displaced to Allentown; (2) Tom Whippman, the sole director and officer of AS, whose status as Ezrine's attorney failed to distance AS from Ezrine; (3) O.D. Glaus, Jr., Genesco's general credit manager, who attempted, with only moderate success, to convince the court that Genesco's presence would significantly enhance the Debtor's accounts collections; and (4) Richard Burker, the administrator of the pension fund, called by AS to (unsuccessfully) attempt to convince us that he did not have authority to waive the pension fund's claims.

At the close of the testimony, the Debtor stood firm to its commitment to the AS offer. The Committee, however, supported Genesco's bid. Its counsel allowed the notes of the Committee's meeting of the previous day which explained his position to be entered of record. Observing that its members included bondholders holding about $45 million out of about $60 million of the total unsecured debt of the Debtor, as well as the Union and pension fund creditors, whose claims brought its constituency's claims to over eighty (80%) percent of the Debtor's total debt, the Committee reported that its members had struck a deal. The Union and bondholder entities agreed not to challenge each other's claims, irrespective of whatever bid prevailed. Moreover, in exchange for the withdrawal of the Union entities' claims and an agreement of the Unions to drop all of their appeals from the sale process, the bond-

holders (and one of the trade creditor Committee members) agreed to support Genesco's bid.

The Committee justified its decision by pointing out that, with the concessions of the union entities, the AS offer resulted in only slightly higher dividends to its constituents. Considering the avoidance of litigation and the humanitarian ends potentially served by the Genesco offer, the Committee decided to cast its lot with Genesco. The Committee also argued that the consensus of eighty (80%) percent of the creditors would have probably been sufficient to garner sufficient votes to confirm a plan featuring the sale to Genesco. It also argued that it was a more appropriate representative of the creditor body than the cadaverous Debtor, and that therefore its exercise of discretion should be preferred over the exercise of discretion by a debtor in a liquidating Chapter 11 case.

On the next day, we invited the Debtor and the Committee to indicate its first, second, and third choices among the alternative of denying the § 363(b) motion altogether or allowing a sale to either AS or Genesco as the successful bidder, in their submissions due later that day. In its submission, the Committee unequivocally supported the sale to AS over the alternative of denial of the motion. The Debtor similarly indicated a preference for allowing a sale to Genesco to denial of the § 363(b) motion. Among the interested parties, only the Union expressed a preference for denial of the motion.

## C. DISCUSSION

■ In resolving this dispute, we begin by observing that § 363(b) allows only the trustee and, in the absence of a trustee in a Chapter 11 case, a debtor in possession ("DIP"), 11 U.S.C. § 1107(a), to sell a debtor's assets other than in the ordinary course of business. Thus, deference to a DIP's decision as to a successful bidder of its assets is appropriate, and that decision may be honored unless it is proven that the DIP abused that discretion.

The prosecution of this case as a liquidating Chapter 11 case and the sale of the Debtor's assets outside of the plan-process were issues resolved, without substantial opposition, prior to the June 3, 1993, hearing. We note that the local office of the United States Trustee ("UST") alone questioned the Chapter 11 status of this case, and only the UST and this court initially (and later, the Unions) questioned the propriety of the use of a § 363(b) sale as the vehicle for disposition of the Debtor's assets. The reasoning relied upon by the UST in making its argument regarding the impropriety of allowing liquidating Chapter 11 cases generally is well-expressed in the decision of Bankruptcy Judge Warren Bentz in *In re Lyons Transportation Lines, Inc.*, 123 B.R. 526, 533–35 (Bankr. W.D.Pa.1991), that liquidation is the function of a Chapter 7 case, not a Chapter 11 case. However, we note that, in *In re Titusville Country Club*, 128 B.R. 396, 398–400 (Bankr.W.D.Pa.1991), Judge Bentz allowed a DIP to sell all of its assets in a pre-confirmation § 363(b) sale. In so doing, Judge Bentz applied, basically, the "stricter scrutiny" test set forth by this court in *In re Industrial Valley Refrigeration & Air Conditioning Supplies, Inc.*, 77 B.R. 15, 21 (Bankr.E.D.Pa.1987) (hereinafter "*IVR*"), *i.e.*, the § 363(b) sale proponent must make a "strong showing" of

> accurate and reasonable notice; ... that the price to be paid is adequate, i.e., fair and reasonable; and ... that "good faith," e.g., the absence of any lucrative deals with insiders, is present. The strength of the showing necessary to satisfy each of these elements is heightened by the fact that the protections of Subchapter II of Chapter 11 are absent, and such agreements are typically considered on an expedited basis, thus impeding interested parties from making the complete investigation and amassing of contrary evidence which otherwise would be possible.

Although the strong feelings of the three participants in this fray who have been embattled for the past year—the Debtor, the Unions, and the Ezrine entities—caused them to variously accuse both the Debtor and the Committee of breaching their re-

spective fiduciary duties in espousing the positions which they did, the fact remains that no party has sought to convert this case to a Chapter 7 case or appoint a trustee to replace the DIP, nor has any party sought to reconstitute the Committee. We therefore must accept these parties' positions as legitimate expressions of their respective clients or constituencies.

 Contrary to the arguments of AS, which suggest that we must approve its bid solely because it is the highest, we find the Committee's position not only appropriate but socially responsible. We perceive nothing inconsistent between the holding of *In re Financial News Network, Inc.,* 980 F.2d 165, 169–70 (2d Cir.1992), that bankruptcy courts have broad flexibility in determining which of several bidders should be deemed the successful bidder at a § 363(b) sale, with the principle of *In re Stanley Engineering Corp.,* 164 F.2d 316, 318–20 (3rd Cir.1947), *cert. denied sub nom. Root v. Galman,* 332 U.S. 847, 68 S.Ct. 351, 92 L.Ed. 417 (1948), that a bankruptcy court should not allow the highest bid at an auction to be overbid after the sale. The result in *Stanley Engineering* is the equivalent of the holding in *In re Gel–Bern Industries, Inc.,* 526 F.2d 627, 629 (1st Cir. 1975), which the *Financial News* court distinguished as examples of

> relatively straight-forward asset sales with simple cash offers from rival bidders in which one party emerged clearly victorious at the auction, and the losing party then made a belated attempt to trump the winning bid,

980 F.2d at 169, as compared to the "far more complicated" scenario presented in that case. *Id.* at 170.

 We therefore have no doubt that, in an appropriate setting, a bankruptcy court, sitting in the Third Circuit as well as the Second Circuit, could appropriately award a bid to a lower bidder, when that lower bidder had other factors, including even an element as lacking in direct economic impact as "societal needs," in its favor. The Bankruptcy Code, like any law, must be read in its context as a tool of mankind, not a body of edicts to which mankind is a slave irrespective of its interests to the contrary.

 Applied to the instant factual setting, we have little doubt that, if the Debtor as well as the Committee preferred Genesco's bid, this court should and would proceed to confirm the sale to Genesco. However, we begin to have difficulties in following this course when we are asked to prefer Genesco's bid over that of AS in the face of the wishes of the DIP who wishes to resolve the § 363(b) sale in a contrary manner.

 It is only in the context of a strong and unusual case to the contrary in which a bankruptcy court should approve a sale to a party which the DIP does not deem the highest and/or best bidder in an auction sale. We could far more easily justify the denial of the § 363(b) motion entirely on a number of grounds, most notably that the conditions of the sale to be accepted would be different than if the Debtor attempted to effect a sale through the reorganization process, as opposed to requiring the Debtor to accept a bid other than its choice. The Committee does not feel so strongly about its preference of Genesco's bid that it wishes to risk the loss of AS's bid in the plan confirmation process. Therefore, denial of the § 363(b) motion is deemed by this court not to be a feasible alternative which either the Debtor or the Committee wishes to pursue. This court concludes that, in the face of opposition from the Committee and the Debtor, it would be inappropriate to effectively reconsider the § 363(b) process put into motion by the April 16, 1993, Order.

 This case is clearly a liquidating Chapter 11 case and that factor justifies some greater deference to the Committee's viewpoints than were it a reorganization case. This is because the principle underlying rationale for the "business judgment rule," *i.e.,* that a DIP is entitled to some free reign in fulfilling its perceived mission of aiding the economy (and, ironically, the job market) by keeping an ongoing business afloat, is lacking in such circumstances. *Compare In re Simasko Produc-*

tion Co., 47 B.R. 444, 449 (D.Colo.1985); and In re Curlew Valley Associates, 14 B.R. 506, 509–14 (Bankr.D.Utah 1981).

■ However, a liquidating Chapter 11 case is nevertheless first and foremost a Chapter 11 case. Having neither sought to convert this case to a Chapter 7 case nor to appoint a trustee, the Committee has relegated its constituency to a position where, under the Code, its views must be subjected to the deference to the Debtor's wishes. Cf. In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir.1983) (bankruptcy court is admonished not to "blindly follow the hue and cry of the most vocal special interest groups," in that case the official Creditors' Committee). But cf. In re St. Mary Hospital, 86 B.R. 393, 396–97 (Bankr.E.D.Pa.1988) (a debtor's discretion in setting the direction of a case is diminished where a motion for appointment of a trustee (ultimately granted) is pending).

■ As we perceive it, the critical issue is whether the Debtor's request satisfies the IVR standards for § 363(b) sales, see IVR, supra, 77 B.R. at 21, and its choice of a successful bidder does not reflect an abuse of the discretion accorded to it in making this choice. Firstly, we note that there is no evidence that the notice of the sale was inadequate. Indeed, spirited bidding occurred which resulted in bids which no parties have suggested are likely to be exceeded through any other process.

There is no evidence of a lack of "good faith" of the Debtor in the sense that the term is used in IVR, supra, 77 B.R. at 21, and in In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 145–46 (3rd Cir. 1986), i.e., the presence of any lucrative deals between the Debtor's insiders and the bidders. The Debtors' officers, directors, and employees have no apparent connection to either AS or Genesco. There does appear to be an aura of rancor and distrust between the Debtor and the Unions carrying over from their disputes over the last year which unfortunately could have played a role in the Debtor's decision not to consider Genesco's pro-union offers and its consequent choice of the AS bid from an entity controlled by its previous suitor, Ez-

rine. Frankly, we were somewhat appalled at Ameye's unwillingness to consider employment prospects for the Debtor's former employees as at least a factor in the Debtor's choice of a successful bidder. However, our differences with the weighing process utilized by the Debtor do not rise to the level of our branding the Debtor's own weighing processes as "bad faith."

Finally, it is difficult to argue that preferring a $7.1 million bid to a $5.0 million bid constitutes a failure to accept an adequate price of the Debtor's assets. The piecemeal and inconclusive evidence at the hearing of June 3, 1993, relating to the value of the Genesco offer failed to convince us that the $2.1 million gap was closed by the conditions offered by Genesco. The burden was clearly upon Genesco, the Union, and/or the Committee to do so in light of this great monetary gap between the bids. Nevertheless, no quantifications of the value of the job opportunities of the Debtor's former workers or of the prospects of a higher recovery in the Aetna Shirt litigation if Genesco were the successful bidder were presented. We were not convinced that Genesco's success as a bidder would result in a significantly greater collection of receivables by the Debtor, although Genesco attempted, without much success, to produce such evidence through Glaus. The waivers of the Unions' and pension funds' claims were proven to provide a measurable supplement of about $1.2 million to Genesco's bid. However, this factor still leaves Genesco's offer almost $1 million short.

Given these figures, it is difficult to conclude that the Debtor has failed to show that its choice of AS's bid over that of Genesco was not calculated to obtain an adequate bid. We do not consider it inconceivable that, on a different record, we could find that the Debtor's valuation of Genesco's offer to attempt to hire the Debtor's former employees as too contingent to receive any consideration was an irrational determination, and that this absence of rationality would be sufficient to shift the balance against our granting deference to the wishes of the Debtor. How-

ever, it is true that Genesco made no guarantees of hiring any former employees of the Debtor. In the only case which the parties could locate where the prospects for employment of a debtor's former workers was noted as a factor in a court's pronouncing the winning bidder in a bankruptcy sale, *In re Prairie Coal Co.*, 40 F.Supp. 894, 895 (E.D.Ill.1941), the successful party promising employment also made the higher monetary offer. In the instant case, even with the subsidies provided to Genesco's bid by the actions of the Union and the pension plan, the simple fact is that Genesco, whether it would not or could not, certainly did not, match the monetary commitment of AS in making its bid. The Committee conceded that the offer of Genesco was probably lesser from a strictly financial viewpoint. The difference between the position of the Committee and that of the Debtor was that the Committee's members were simply collectively inclined to place a value on Genesco's somewhat vague commitment to hire the Debtor's former employees, and the Debtor was not. The evidence presented was not so convincing that, in this instance, the humanitarian values arguably served by the Genesco bid greatly outweighed the financial superiority of the AS bid.

In sum, we cannot find the Debtor's position in favor of accepting the AS bid as lacking in the requisite "adequacy" in substance on this record. Our heart is heavy in rendering this decision, because we would not have been inclined to exercise our discretion as the Debtor did. One of the underlying rationales for the enactment of Chapter 11 is its potential to preserve jobs for the employees of the DIPs. It is disturbing to perceive a DIP which appears to accord so little consideration to this element. However, the discretion in what we find is a relatively close case is not, as we perceive it, ours to exercise.

 Thus, however morally reprehensible we find the Debtor's conduct, we nevertheless cannot conclude that the prospects of Genesco's employment of the Debtor's former employees is so clear that it necessarily outweighs the rather clear economic factors to the contrary. Some exercise of discretion and judgment in measuring this factor among the other factors was appropriate. We cannot find that the level of proof presented at the June 3, 1993, hearing established that the Debtor's exercise of discretion and judgment was abused. Therefore, we conclude that we must defer to the Debtor's discretion and approve its requested approval of the sale of its assets to AS.

## D. CONCLUSION AND ORDER

The Debtor presented a lengthy proposed Order approving the sale to the court. We are prepared to execute an Order having this effect. However, some of the findings recited in that Order were already made herein, *i.e.*, that the *Abbotts Dairies/IVR* criteria are met. Others are apparently inappropriate in light of statements made during these proceedings, *e.g.*, AS's recitation that no licensing agreements would be assumed. The final Order should be more succinct than that proposed, although it should include all necessary recitations to promptly effect the sale and should memorialize all commitments made by AS during the course of the bidding process. We therefore enter the following Order:

1. The Debtor shall file and serve upon all interested parties and the court in chambers a copy of a proposed Order consistent with the conclusions expressed herein that its preferred sale of the Debtor's assets to AS must be approved on or before 4:30 P.M. on June 9, 1993.

2. All interested parties shall file and serve any comments on the form of the proposed Order on or before 4:30 P.M. on June 10, 1993.

3. It is the intention of this court to enter an Order, consistent with the conclusions expressed herein, in light of the submissions received in paragraphs 1 and 2 *supra*, on June 11, 1993.