**In re ST. MARY HOSPITAL, Debtor.**

**Bankruptcy No. 88–11421S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

June 16, 1993.

David S. Fishbone, Ciardi, Fishbone &
DiDonato, Philadelphia, PA, for trustee.

Henry F. Siedzikowski, Blue Bell, PA, for debtor.

Gary M. Schildhorn, Gary Bressler and Douglas Candeub, Adelman Lavine Gold & Levin, Philadelphia, PA, for creditors' committee.

John Gough, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, for Franciscan Health Services.

Virginia Powel, Asst. U.S. Atty., Philadelphia, PA, for the U.S.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

### *MEMORANDUM*

DAVID A. SCHOLL, Bankruptcy Judge.

### A. *INTRODUCTION*

The instant dispute presents a question of the proper interpretation of certain terms of the Third Amended Joint Chapter 11 Plan, confirmed on March 14, 1990 ("the Plan"), in the case of ST. MARY HOSPITAL ("the Debtor"), the proponents of which were the Debtor; ROGER B. HISER ("the Trustee"); the Committee of Unsecured Creditors ("the Committee); and Franciscan Health System ("FHS"), the Debtor's parent organization.[1] In material terms, the dispute is a contest over who gets certain unanticipated excess funds now projected to remain upon distribution to creditors in this case. The Trustee has proposed—and FHS supports—that the projected excess funds of about $770,000 be returned to FHS for distribution to an FHS affiliate, while the Committee, joined by the United States of America ("the USA"), contends that the excess funds belong to an elective class of unsecured creditors whose members include the USA.

On behalf of itself and the Trustee, FHS contends that the unexpected turn of events which resulted in the surplus render the Plan ambiguous, and that extrinsic evidence may be considered in determining the parties' true intentions regarding the distribution. The Committee, speaking for itself and the USA, first argues that the Plan is unambiguous and that its language unequivocally supports the Committee's interpretation. In the alternative, the Committee argues that any ambiguity should be resolved in its favor.

Although this court agreed, at the May 19, 1993, hearing on the Objections to the Trustee's proposed distribution, that the critical terms of the Plan were sufficiently ambiguous to allow the admission of extrinsic evidence to aid in its proper interpretation, the only extrinsic evidence thereupon presented by FHS was a Stipulation of Facts which was inconclusive as to the parties' intentions on the issue in dispute. That evidence supported only the conclusion that the parties did not consider the disposition of unanticipated excess funds in drafting the Plan. Such inconclusive evidence is insufficient, in our weighing of the competing arguments and interests, to allow us to read the Plan other than literally. Therefore, although we find certain equities in favor of FHS' position, particularly in light of FHS' generous financial contributions to the Plan and its desire that the excess funds be distributed to the benefit of a most worthy cause, we are compelled to accept the Committee's interpretation of the Plan. Therefore, we will sustain the Committee's Objections and will direct the Trustee to prepare a new Order of Distribution consistent with the Objections.

### B. *HISTORY OF THE INSTANT DISPUTE*

On March 11, 1993, pursuant to our Order of February 11, 1993, the Trustee filed

---

1. This bankruptcy case has a rich history which can be fully gleaned by examination of the five published Opinions arising out of it. *See In re St. Mary Hospital,* 125 B.R. 422, 423 (Bankr. E.D.Pa.1991) (court defers to state administration process for resolution of Medicaid reimbursement dispute); *In re St. Mary Hospital,* 117 B.R. 125, 127 (Bankr.E.D.Pa.1990) (disputes between Debtor and purchaser of its hospital assets resolved) (cited hereinafter as *"St. Mary III"*); *In re St. Mary Hospital,* 101 B.R. 451, 453–

54 (Bankr.E.D.Pa.1989) (court awards the Trustee damages against doctors who removed a clinic from the Hospital) (cited hereinafter as *"St. Mary II"*); *In re St. Mary Hospital,* 89 B.R. 503, 504–06 (Bankr.E.D.Pa.1988) (court refuses to require the Trustee to pay Medicare overpayments to retain Medicare affiliation); and *In re St. Mary Hospital,* 86 B.R. 393 (Bankr.E.D.Pa.1988) (court enjoins closure of hospital orchestrated by the Debtor, leading to appointment of the Trustee) (cited hereinafter as *"St. Mary I"*).

his proposed Third and Final Order of Distribution ("the Order"). The Order was calculated on the principle that all creditors, even those who had opted to release FHS from any liability in its attempted closure of the Debtor hospital in exchange for FHS' contribution of $800,000 to fund the Plan, would not receive more than one hundred (100%) percent of their claims. These calculations resulted in a surplus which the Order proposed to remit to the St. Agnes Medical Center ("St. Agnes"), an FHS affiliate hospital.

The Committee objected to the Order on the ground that its calculation failed to give the creditors who had opted to release FHS in consideration for a supplemental payment the benefit of their bargain. Specifically, the Committee pointed to the following provisions in Section Three of the Plan as directing a distribution contrary to that proposed by the Trustee:

*Class IV:* Class IV consists of all holders of Unsecured Claims. Creditors in Class IV will receive distribution in Class IV, unless waived. Class IV Creditors will receive a distribution in Class IV whether or not such Creditors elect to participate in Class IV(A). *The receipt of distribution by a Class IV Claimant under Class IV(A) shall not reduce its (or his or her) Claim in Class IV* (emphasis added).

· · · · · ·

*Class IV(A):* Class IV(A) is a class consisting of all class IV Creditors who or which elect to participate in Class IV(A). *Only those Creditors who affirmatively elect to participate in Class IV(A) shall be entitled to receive distribution in Class IV(A) and distribution shall be contingent upon the satisfaction of the conditions precedent* [which were deemed satisfied] (emphasis is in original).

· · · · ·

FHS and Affiliates will pay $800,000 to fund Class IV(A). In consideration for funding Class IV(A), FHS and Affiliates require that Creditors who elect to participate in Class IV(A) release FHS and Affiliates as set forth in Section Six herein. A Creditor's election to participate in Class IV(A) shall constitute its release of FHS and Affiliates, which shall become effective on the Effective Date.

On the Effective Date, or as soon thereafter as a Class IV Claim is determined to be an Allowed Class IV Claim by a Final Order, each holder of an Allowed Class IV Claim who elects to participate in Class IV(A) shall be paid, in cash, its (or his or her) *pro rata* share of such Claim from the $800,000 fund, unless the holder of such Claim agrees to a different treatment. If a Class IV Creditor elects to participate in Class IV(A), such Creditor shall be entitled to distribution under both Class IV and Class IV(A). *The receipt of distribution by a Class IV(A) Claimant under Class IV shall not reduce its (or his or her) Claim in Class IV(A)* ... (emphasis added).

The Committee's basic argument is that, since there is no qualification limiting this Plan language to an instance where there is a shortfall in funds available to distribute to Class IV and Class IV(A) members, its literal terms must be enforced, requiring that the distributions made to Class IV(A) members do not effect the distributions made to the Class IV members generally, even in an instance where an admittedly unexpected availability of a surplus of funds exists, and this will result in Class IV(A) members receiving more than one hundred (100%) percent of their claims.

FHS responds to this straightforward argument by arguing that the distribution contemplated by the Committee which would result in a distribution of greater than one hundred (100%) percent to Class IV(A) members constitutes a result which the extrinsic evidence establishes that no parties had contemplated at the time of confirmation. In support of the latter assertion, FHS points to language in the Disclosure Statement accompanying the Plan, echoed in the Stipulation of Facts, that a thirty-one (31%) percent distribution was projected for Class IV creditors and a fifty-seven and eight-tenths (57.8%) percent distribution was projected for Class IV(A)

creditors. Observing that deference should be paid to the distribution proposed by the (admittedly) independent Trustee, FHS emphasizes inequities which would flow from the terms recommended by the Committee. FHS further argues that contributions which it freely made on the assumption of a shortfall would, per the Committee, be distributed in such a manner as to allow a windfall to Class IV(A) creditors. Finally, they point out that, under the Committee's formula for distribution, Class IV creditors would receive slightly less than the one hundred (100%) percent distribution which these creditors would receive under the Trustee's proposed Order.

The rejoinder of the Committee is that FHS made its generous contributions to the Plan partially for the purpose of obtaining a release from the Class IV(A) creditors, per the reasoning utilized by Judge Fox of this court in *In re Monroe Well Service, Inc.*, 80 B.R. 324, 334–36 (Bankr.E.D.Pa. 1987). The holding of *Monroe Well, supra*, was expressly stated by the draftspersons of the Plan, per the Stipulation of Facts, to be the model for the Plan provisions in this regard. The Committee argues that the consideration expressly crafted to be paid to those creditors should not now be taken from them because of the fortuitousness of the surplus, which was created from larger than anticipated recoveries from Medicaid/Medicare (about $3.7 million) and preference recoveries (about $422,000), as well as the proceeds from the sale of the Debtor's hospital assets (about $5.2 million) and FHS' contribution (totalling $2.7 million). The fact that Class IV creditors, who are part of the Committee's constituency, would receive slightly more under the Trustee's proposal is discounted as an internal problem of the Committee, which it is empowered to resolve as it sees fit. *Compare In re After Six, Inc.*, 154 B.R. 876 at 882 (Bankr.E.D.Pa.1993) (positions of an official Creditors' Committee

must be accepted as a legitimate expression of the position of its constituency).

## C. DISCUSSION

■ At the threshold of our legal analysis is our acceptance of the parties' agreement that a reorganization plan is and can be analyzed as a contract among the Debtor's creditors, and therefore must be enforced and interpreted under contract law principles.[2] *See In re Texas General Petroleum*, 122 B.R. 306, 307 (Bankr.S.D.Tex. 1990) ("[a] plan of reorganization, in confirmed form, functions like a contract as the debtor and all creditors are bound by the plan").

■ The first question presented is whether the terms of the Plan, at least to the extent they relate to distribution to Class IV(A) creditors, are ambiguous, the sense of both parties being that, if they are not, they necessarily must be clear and unambiguous and will definitely be enforced. As this Court held in deciding a proceeding arising out of this very case, "an unambiguous contract provision must be interpreted as it is written, not as the parties may have meant it or interpreted it." *St. Mary II, supra*, 101 B.R. at 461. *See also, e.g., Brokers Title Co. v. St. Paul Fire & Marine Ins. Co.*, 610 F.2d 1174, 1178 (3d Cir.1979) ("when the parties to an agreement reduce their understanding to a writing that uses clear and unambiguous terms, a court should not look further than the writing itself when asked to give effect to the understanding"). This principle is also echoed in another proceeding arising out of this case, *St. Mary III, supra*, 117 B.R. at 132, where we stated that "an unambiguous contract must be interpreted as it is written, even if the parties meant or interpreted it differently."

■ Despite our statements in *St. Mary II*, 101 B.R. at 461; and *St. Mary III*, 117 B.R. at 132, that the determination of whether a contract term is ambiguous is a

---

**2.** We do not, however, accept the Committee's analysis that the instant Plan consists of three separate contracts between (1) the Debtor and all of its creditors; (2) FHS and the Class IV(A) members; and (3) FHS and Class V members (holders of non-priority vacation pay claims). The contractual relationship resulting from the Plan stands as an integrated whole and must be analyzed in that light alone.

matter of fact, the Third Circuit Court of Appeals has subsequently held that "[d]etermining whether the terms of a contract are ambiguous is a question of law." *St. Paul Fire & Marine Ins. Co. v. Lewis*, 935 F.2d 1428, 1431 (3rd Cir.1991). The latter decision, at *id.*, also cautions that

> [i]n making the ambiguity determination, ..., we must remember that "[t]he language of the policy may not be tortured ... to create ambiguities where none exist." *Pacific Indem. Co. v. Linn*, 766 F.2d 754, 761 (3d Cir.1985).

At the outset of the hearing on the Objections on May 19, 1993, we held that the terms of the Plan, as to the treatment of any excess payment, were sufficiently ambiguous as to allow the admission of extrinsic evidence to clarify its terms on this point. However, unlike the evidence regarding the "actual" meaning of the clause found by this court to be ambiguous in *In re Valley Forge Plaza Associates*, 113 B.R. 892, 901–92 (Bankr.E.D.Pa.), *aff'd in part & rev'd in part on other grounds*, 120 B.R. 789 (E.D.Pa.1990), the evidence presented by FHS in the form of the Stipulation of Facts in support of its interpretation of the disputed Plan provisions was itself inconclusive. It appears that counsel negotiating the Plan gave no specific consideration to this possibility. We are therefore compelled to resort to interpretation of the clauses in issue, in a general sense, without the aid of much in the way of enlightening extrinsic evidence.

■ The Plan provides that "Class IV Creditors will receive a distribution in Class IV whether or not such Creditors elect to participate [in] Class IV(A)" and that "[t]he receipt of distribution by a Class IV(A) Claimant under Class IV shall not reduce its (or his or her) claim in Class IV(A)." These provisions constitute rather strong and clear statements of a distribution scheme which may not be consistent with the Trustee's apparent guiding principle in fashioning the Order: that the Class IV creditors should be precluded from receiving more than one hundred (100%) percent of their claims.

■ Although FHS is correct that the Plan does not specifically address the situation where a surplus of funds existed, it is clear that the language of a plan does not have to address every situation, conceivable or inconceivable, to be effective in a given situation. It only need contain language which is found to be sufficiently specific to cover a particular subject-matter area for that language to control in the disposition of matters arising in that area. The Plan literally provides that, under *any* circumstances, Class IV(A) creditors should receive their "regular" distribution in addition to their share of the $800,000 FHS contribution earmarked for their benefit. It is difficult to understand why these clear statements should not be given effect.

■ It has been proven to our satisfaction that none of the Plan proponents, in drafting the Plan, contemplated the present circumstances, *i.e.*, the existence of a surplus. However, as the Committee points out, reformation of a contract for mistake is only appropriate when all of the parties or the party charged with liability make a mistake as to existing facts, not future developments. *See Aluminum Co. of America v. Essex Group, Inc.*, 499 F.Supp. 53, 69 (W.D.Pa.1980) (applying Indiana law); *Ancient Order of United Workmen v. Mooney*, 230 Pa. 16, 19–20, 79 A. 233, 233–34 (1911); *Loyal Christian Benefit Ass'n v. Bender*, 342 Pa.Super. 614, 618, 493 A.2d 760, 762 (1985); and 3 A. CORBIN, CORBIN ON CONTRACTS 584–88 (1960). *Compare In re CS Associates*, 121 B.R. 942, 952–55 (Bankr.E.D.Pa.1990) (contract reformed due to mistake of insurer, on the basis of facts existing at that time, in modifying insurance policy terms without authority to do so). The future is always unknowable with certainty. Contracts are made to attempt to create certainty in light of this. Undoing contractual agreements undermines the fundamental contractual purpose of creating certainty for the future. Therefore, we cannot decline to enforce the Plan's terms simply because unanticipated future developments came to pass.

We are also not totally swayed by the argument that, under the Committee's view of how distribution should occur, Class IV(A) creditors are receiving a windfall without consideration therefor. As per *Monroe Well,* 80 B.R. at 334–35, which the draftspersons agree was their model for formulation of the critical language of the Plan, FHS could obtain a release only by the individual decision of each Class IV claimant to opt into Class IV(A). FHS received consideration in the form of a release from each creditor who opted into Class IV(A). It would be inappropriate for this court to speculate on the value of the claims released by Class IV(A) creditors, or to conclude, with the benefit of hindsight which the draftspersons of the Plan could not have possibly had, that these releases were not worth the receipt of payment of more than one hundred (100%) percent of these creditors' claims.

Therefore, we conclude that FHS' principal arguments in support of our declining to give full effect to the literal meaning of the Plan's terms, as the Committee urged, must be rejected.

■ Several other arguments made by FHS are worthy of at least brief treatment. In its pre-trial Brief, FHS argues that the absolute priority rule and the "fair and equitable" requirement set forth in 11 U.S.C. § 1129(b) forbid payment to Class IV(A) creditors of more than one hundred (100%) percent of their claims. However, 11 U.S.C. § 1129(b) comes into play only when (1) considering whether a Plan should be confirmed (2) in a situation where a plan fails to satisfy the requirement appearing at § 1129(a)(8) that all classes accept the plan. *See In re Richard Buick, Inc.,* 126 B.R. 840, 850 (Bankr.E.D.Pa.1991). Here, the Plan has been confirmed under § 1129(a). All impaired classes voted for this Plan over three years ago. They cannot now repudiate that vote, even if the Plan contains provisions which have been interpreted differently than some (but not all) of the Plan proponents apparently believed that they would be.

FHS also argues, throughout its Briefs, that considerable equities are in its favor because it expended a large sum of money to effectuate a plan for the benefit of all parties involved, even though it initially opposed the Plan's substance. *See St. Mary I, supra,* 86 B.R. at 394–97, 401–03. We agree with FHS' observation that, despite its initial dissatisfaction with the direction which this case took, it made a most commendable, successful, good faith effort to cooperate with the other Plan proponents in effectuating the Plan. It is, as this court expressed at the hearing on May 19, 1993, somewhat distressing to "reward" FHS for its benevolence by awarding the excess of funds arising at least partially from its generosity to creditors who had no expectation of receiving the amounts which they will receive if the Objections are sustained. St. Agnes appears to be a more worthy beneficiary than the "lucky" Class IV(A) creditors.

■ However, we cannot escape the conclusion that the confirmed Plan provides that Class IV(A) creditors are entitled to the payments which the Committee urges that they must receive. A contract, at least when fully negotiated among parties equally well-represented by counsel, cannot be disaffirmed just because its effects were unanticipated and, in retrospect, appear unfair. One purpose of writing contracts is to settle the resolution of disputes between parties in the face of unanticipated contingencies. Good lawyers, such as those who drafted the Plan, are expected to provide for unexpected contingencies in the products of their contractual draftsmanship. There is no suggestion that the Committee has acted in any way improperly or unfairly in taking the position which it has. When parties to a contract, like all of the parties here, come to equity with clean hands, equity must side with the parties who seek to enforce the terms of the contract. Hence, the terms of the Plan must control, even in the face of contrary equitable considerations.

■ Finally, FHS argues that this court should accord "considerable deference" to the Trustee's proposed Order of Distribution "not only because he is the court-appointed officer of the Court, but

also because he was a Plan Proponent, who negotiated the Plan and understands its intent, and because he has no personal interest in the outcome of the controversy." Deference to a Trustee's recommendation on a particular matter becomes an issue where that matter is within the scope of the Trustee's discretionary powers. *Compare After Six, supra,* 154 B.R. at 882–83 (deference in choice of a successful bidder at a sale is granted to a debtor-in-possession ("DIP") in the conduct of a sale of assets because the DIP is alone authorized to conduct such a sale). However, here, the Trustee was only a co-proponent of the Plan, with, *inter alia,* the Committee. Thus, where, as here, the language of a Chapter 11 plan, jointly and voluntarily proposed and accepted by several parties and confirmed by the court, provides for a certain distribution, the language of the Plan must control. The Trustee, being no more than a co-proponent of the Plan, is bound by its terms, and compromises his neutral role if he does not strictly follow the terms of the Plan in the performance of his duties.

## D. CONCLUSION

We conclude that the Trustee is obliged to adhere to the interpretation of the Plan presently advanced by the Committee in rendering distribution according to its terms. Our accompanying Order sustaining the Objections of the Committee (and the USA) to the proposed distribution Order will require him to do so.

### ORDER

AND NOW, this 16th day of June, 1993, upon consideration of the Stipulation of Facts which the interested parties agreed would constitute the record at a hearing of May 19, 1993, on the Trustee's proposed Third and Final Order of Distribution ("the Order") and the Objections of the Official Committee of Unsecured Creditors of St. Mary Hospital ("the Committee") and the United States of America ("the USA") thereto, and the various Briefs submitted by certain of the interested parties relative thereto, it is hereby ORDERED AND DECREED as follows:

1. The Objections of the Committee and the USA to the Order are SUSTAINED.

2. The Trustee shall file and serve upon all interested counsel listed below and the court in chambers an Amended Final Order of Distribution consistent with the Objections and the accompanying Memorandum of this date on or before June 25, 1993.

3. Any Objections to the forms of this Order shall be filed and served upon all other interested parties and the court in chambers on or before July 2, 1993.

4. The Trustee or counsel for the Trustee shall thereafter file, *and serve a Certification of such filing upon the court in chambers,* the cancelled checks and zero bank statement; or an affidavit, pertaining to disbursements made pursuant to the Order of Final Distribution, setting forth that there is a zero balance in the account and that the cancelled checks are no longer available on or before November 1, 1993.