**In re ST. MARY HOSPITAL, Debtor.**

**Bankruptcy No. 88–11421S.**
**Misc. No. 93–146.**

United States District Court,
E.D. Pennsylvania.

Aug. 4, 1993.

John Francis Gough, Natalie Ramsey, David H. Marion, Philadelphia, PA, for FHS.

Gary D. Bressler, Douglas N. Candeub, Philadelphia, PA, for Unsecured Creditors Committee.

### MEMORANDUM AND ORDER

DITTER, District Judge.

This case comes before me on a motion for a stay pending an appeal of a bankruptcy judge's order allowing a distribution to unsecured creditors 155 B.R. 345.[1]  Franciscan Health System (FHS) seeks the stay.  It is the parent organization of St. Mary Hospital, the debtor, and during the course of the bankruptcy it made significant contributions to the hospital's estate.  I find it unlikely that the appeal will be successful and therefore must refuse the motion.

The Amended Joint Chapter 11 Plan (the Plan), groups the creditors of St. Mary Hospital into several classes.  Class IV consists of all holders of allowed unsecured claims.  Under the Plan, a Class IV credi-

---

[1] The appeal of the bankruptcy judge's June 16, 1993, order is docketed at Civil Action No. 93–3980.

tor could elect to participate in a sub-class of unsecured creditors, Class IV(A), by giving up any claims the creditor might have against FHS or any FHS affiliate. In return, Class IV(A) creditors would participate *pro rata* in an $800,000 fund created by FHS and intended to augment a contemplated shortage of assets that would be available to make the Class IV creditors whole.[2]

The Plan provides that:

· "If a Class IV creditor elects to participate in Class IV(A), such Creditor shall be entitled to distribution under both Class IV and Class IV(A)." (Amended Joint Chapter 11 Plan at 9.)

· "The receipt of distribution by a Class IV Claimant under Class IV(A) should not reduce [the creditor's] Claim in Class IV." (*Id.* at 7.)

· "The receipt of distribution by a Class IV(A) claimant under Class IV shall not reduce [the creditor's] Claim in Class IV(A)." (*Id.* at 9.)

By May 19, 1993, when the trustee filed a proposed third and final order of distribution, it had become clear that more assets were available for distribution to Class IV creditors than any party in interest had anticipated when the Plan was negotiated and adopted. As a result, those creditors who had elected to participate in Class IV(A) would receive in excess of 100 cents on the dollar. The trustee proposed cutting their Class IV distribution so that no creditor would receive more than 100 per cent of his claim, thus leaving a surplus of approximately $770,000 in the bankruptcy estate. The trustee recommended that this surplus be given to St. Agnes Medical Cen-

ter, another charitable hospital division of FHS.

The Unsecured Creditors' Committee objected to this proposal contending that it violated the clear language of the Plan.[3] FHS argued that the terms of the Plan had been rendered ambiguous by the asset-surplus and that extrinsic evidence was required to determine the parties' true intention with regard to the surplus and to form a basis for equitable reformation by the bankruptcy court. The committee countered that the distribution was fair and equitable because any money Class IV(A) creditors received above the amount of their allowed claim was merely consideration for the release they executed in favor of FHS and was required by *Monroe Well.*

The bankruptcy court held a hearing on May 19, 1993, on the issue of ambiguity and the parties submitted a factual stipulation in lieu of testimony. The stipulation *inter alia* stated:

No specific thought was given at the time of the negotiation and drafting of the Plan by the plan drafters to the current circumstances since all plan drafters expected, at that time, that unsecured creditors were likely to receive a distribution in the range set forth in the Disclosure Statement.[4]

(*See* Committee's Resp.Opp. FHS's Motion for Stay Pending Appeal Ex. D ¶ 7.)

■ In a memorandum sustaining the committee's objections, the bankruptcy court began its analysis by considering whether the terms of the Plan, as they relate to the trustee's distribution to Class IV(A) creditors, are ambiguous.[5] The court stated that while at the May 19, 1993, hearing it found the Plan to be "sufficient-

---

**2.** The parties intended Class IV(A) to comply with the requirements of *In re Monroe Well Service, Inc.,* 80 B.R. 324 (Bankr.E.D.Pa.1987) (adopting reasoning of *In re AOV Industries,* 792 F.2d 1140 (D.C.Cir.1986) and holding that creditors' voluntary releases of claims against non-debtor funder in return for additional consideration did not violate bankruptcy provisions). (*See* Committee's Resp.Opp. FHS's Motion for Stay Pending Appeal ¶ 13.)

**3.** For the Plan language on which the Committee relies, *see supra* at 236.

**4.** In the disclosure statement, it was projected that the unsecured creditors would receive approximately a 57.8% distribution with FHS's participation and 33% without. (*See* Disclosure Statement of Plan Proponents at 11–12.)

**5.** The bankruptcy court noted, and I agree, that the Plan must be interpreted using contract principles.

ly ambiguous to allow extrinsic evidence to clarify its terms" on the issue of distribution, "the evidence presented by FHS in the form of the Stipulation of Facts in support of its interpretation of the disputed Plan provisions was itself inconclusive."

The bankruptcy court then considered the plain language of the Plan and found that "[t]he Plan literally provides that, under *any* circumstances, Class IV(A) creditors should receive their 'regular' distribution in addition to their share of the $800,-000 FHS contribution earmarked to their benefit." (June 16, 1993, Memorandum at 10.)

The bankruptcy court also agreed with the committee that reformation of the Plan under the contract-doctrine of mistake was inappropriate. It pointed out that the doctrine of mistake applied only when the parties had made a mistake as to an existing fact, not when there was merely an unanticipated, future development. The court stated that because the existence of the surplus was an unanticipated future development, the Plan could not be reformed.

The bankruptcy court was also not persuaded that "Class IV(A) creditors were receiving a windfall without consideration therefor," noting they had given releases in return for a share in the $800,000 fund established by FHS. The bankruptcy court

also rejected the alternative arguments proffered by FHS.[6]

FHS requested that the bankruptcy court stay its order pending an appeal. The bankruptcy court denied that request holding that there was "little probability of success in this appeal" and that it could not "justify any delays in final distribution to the creditors and hence there will be substantial injury to other parties if the relief sought is granted." (June 25, 1993, Order)

FHS now asks that I stay the June 16 order. It contends that there is a substantial likelihood that it will succeed on the merits of its appeal.[7] FHS further argues that it will suffer irreparable harm if the order is not stayed because the funds will be distributed to a large number of creditors and will be difficult to recover if the appeal is successful. It also alleges that the Class IV(A) creditors will not be harmed by the stay because the funds are being held by the trustee in an interest-bearing account. The committee objects to the stay.

I must examine four factors when determining whether to grant a stay pending appeal: 1) the likelihood of success on the merits of the appeal; 2) the irreparable harm to movant if the stay is not granted; 3) the harm to the non-moving party if the stay is granted; and 4) the public interest. *See Republic of the Philippines v. West-*

---

**6.** FHS also argued that the payments to Class IV(A) in excess of 100% violated 11 U.S.C. § 1129(b), that equitable considerations weigh in its favor such that the court should exercise equitable reformation, and that the court should give deference to the trustee's recommendations.

**7.** FHS points to four legal conclusions of the bankruptcy court that it contends are incorrect and are subject to plenary review:
   a) The Memorandum accompanying the June 16 Order is internally inconsistent in first holding that the critical terms of the Plan are ambiguous and then holding that they are clear and controlling;
   b) As a matter of law, having determined that the provisions of the plan were ambiguous, the bankruptcy court failed to interpret the Plan in accordance with the intent of the parties;
   c) Because the Court found that the parties failed to have a meeting of the minds, as a

matter of law, the contract/settlement embodied in the Plan should have been equitably reformed; and
   d) Because the Court found that the Plan does not address the windfall situation presented, as a matter of law, equity requires that missing terms be supplied to prevent creditors from being unjustly enriched to the disadvantage of FHS as the plan funder and equity interest holder in the Debtor.
(FHS's Motion for Stay Pending Appeal ¶ 13.) (citations omitted) It also contends that "[h]aving determined that the Plan is ambiguous, the Court failed even to discuss the numerous provisions of the Plan and related documents that indicate that the intent of the parties in interest at the time that such documents were drafted was that no creditor was to receive more than the 'allowed amount' of such creditors claim." (*Id.* ¶ 14.) However, there was no specific citation to these "numerous provisions" nor could I find any of them in the Plan.

*inghouse Elec. Corp.*, 949 F.2d 653, 658 (3d Cir.1991).

*Likelihood of Success on the Merits.* It is unlikely that FHS will succeed on the merits of this appeal. Three of the issues raised by FHS on appeal are based on the erroneous belief that the bankruptcy judge concluded the Plan was ambiguous. (*See* FHS's Motion for Stay Pending Appeal ¶¶ 13(a), 13(b) & 14.) That is not the case. The bankruptcy court held at the hearing on the objections that under the unanticipated circumstances, it was willing to accept extrinsic evidence on the ambiguity issue. After examining the evidence that the parties adduced, the bankruptcy court did not hold that the language of the Plan was ambiguous.[8] Rather, the bankruptcy court relied upon the plain language of the Plan, rejecting the ambiguity argument, to resolve the distribution issue in favor of the committee.

The bankruptcy court recognized that the plain language of the Plan states unequivocally that a creditor, participating in Class IV(A), will receive a distribution as a Class IV creditor as well as a *pro rata* share of the $800,000 fund under Class IV(A) and that neither distribution will be reduced because of a distribution from the other class. As the bankruptcy court noted, contractual language "may not be tortured to create ambiguities where none exist." *St. Paul Fire & Marine Ins. Co. v. Lewis*, 935 F.2d 1428, 1431 (3d Cir.1991).

The fourth issue raised by FHS assumes that the distribution received by the Class IV(A) creditors is a "windfall" and "unjust enrichment" of Class IV(A) creditors, overlooking the releases given in return for a share of the $800,000 fund. (FHS's Motion for Stay Pending Appeal ¶ 13(d).)

■ Finally, FHS contends that the bankruptcy court should have equitably reformed the Plan because the parties did not

have a "meeting of the minds." (FHS's Motion for Stay Pending Appeal ¶ 13(c).) This issue will also have little chance of success on appeal. When clear language applies to a situation arising during the performance of an agreement, a court may not ignore that language merely because the parties did not anticipate that particular occurrence.

Therefore, I conclude that it is unlikely that FHS will succeed on the merits of this appeal.

*Irreparable Harm to Movant.* FHS has demonstrated that if the stay is not granted, the funds at issue will be distributed to numerous creditors and thus will be extremely difficult to recover in the event it succeeds in its appeal. I agree that for all practical purposes, it would be next to impossible to recover all payments from all creditors. To that extent, FHS may well suffer irreparable harm without a stay.

*Harm to Nonmoving Party.* FHS contends that because the funds are being maintained by the trustee in an interest-bearing account, the creditors will not be harmed by the imposition of a stay. I disagree. Interest does not always adequately compensate an individual for a delay in payment. A creditor may be harmed by the delay caused by the stay.

*Public Interest.* The public interest is not implicated in this case.

Because I find that there is no substantial likelihood of success on the merits, and that the creditors could be harmed by a further delay of payment, I must deny the stay pending appeal.

---

**8.** The Third Circuit has defined ambiguity as "[i]ntellectual uncertainty; ... the condition of admitting of two or more meanings, of being understood in more than one way, or referring to two or more things at the same time." *Mellon Bank v. Aetna Business Credit*, 619 F.2d 1001 (3d Cir.1980). FHS was unable to point to any language in the Plan that was capable of more than one meaning. It merely produced a stipulation which stated that no party considered the situation they now confronted. This is not an ambiguity. It is the occurrence of an unanticipated future event.