**In re GULF STATES STEEL, INC. OF ALABAMA, Debtor.**

No. 99–41958–JSS–7.

United States Bankruptcy Court,
N.D. Alabama,
Eastern Division.

Sept. 27, 2002.

Harry P. Long, Anniston, AL, for trustee.

Jeffrey Herman, Los Angeles, CA, for Ableco Finance LLC.

Mark Williams, Birmingham, AL, for Gadsden Industrial Park, LLC.

Richard H. Cater, Anniston, AL, for Gulf States Reorganization Group, Inc.

**500**

Ralph Strawn, Gadsden, AL, for Objecting Bondholders.

Glen Connor, Birmingham, AL, for United Steelworkers of America.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER GRANTING TRUSTEE'S MOTION FOR AN ORDER AUTHORIZING SALE OF PROPERTY OF THE ESTATE FREE AND CLEAR OF LIENS AND OTHER INTERESTS

JAMES S. SLEDGE, Bankruptcy Judge.

The Motion of James Henderson as the Chapter 7 Trustee of the bankruptcy estate of Gulf States Steel, Inc. of Alabama (the "Trustee") For An Order Establishing Bidding And Other Procedures In Connection With Sale Of Property Of The Estate Free And Clear Of Liens And Other Interests And Motion For Authority For Such Sale (the "Sale Motion") came on regularly for hearing on August 21, 2002, with respect to bidding procedures and related matters, and again on September 16, 2002, in order to confirm the results of the auction conducted by the Trustee and to consider whether the Trustee should be authorized to complete the sale of the subject Steel Mill Assets (as defined below). Both hearings were conducted before the Honorable James S. Sledge in the above-entitled court. After having considered the Sale Motion and the accompanying Memorandum of Points and Authorities, the various other pleadings filed in support of, and in opposition to, the Sale Motion, and reflected on the docket of this case, the testimony presented at such hearings, and the arguments of counsel appearing at such hearings, as reflected in the record of this matter, the Court makes the following findings of fact, conclusions of law, and orders:

**Findings of Fact**

1. The debtor, Gulf States Steel Inc., of Alabama ("debtor" or "Gulf States Steel") commenced this case as a chapter 11 case on July 1, 1999. Shortly thereafter, Gulf States Steel obtained interim and final orders (the "DIP Financing Orders") from this Court granting the motion of Gulf States Steel to obtain postpetition secured financing from Ableco Finance LLC, as agent for certain other lenders ("Ableco"), in the approximate amount of $17 million (the "Ableco Loans"). The DIP Financing Orders, among other things, provided Ableco with a superpriority administrative claim and a lien and security interest upon all assets of the debtor's estate of first priority (with certain minor exceptions noted in the Ableco loan documentation). In order to accommodate the Ableco financing, representatives of the holders of the 13½% Series B First Mortgage Notes (the "Secured Mortgage Notes") in the amount of $190 million (with collateral having an assessed value in excess of $180 million) agreed to subordinate the lien of State Street Bank and Trust Company, as successor in interest to Shawmut Bank Connecticut, N.A., as the indenture trustee ("Indenture Trustee") with respect to such Secured Mortgage Notes, against the property, plant and equipment, and the real property comprising the Gulf States Steel steel mill located in Gadsden, Alabama. In addition to the mortgage liens, the property was encumbered by tax claims and environmental claims.

2. By order entered on July 20, 1999 (the "Preferred Trade Vendor Order"), at the request of Gulf States Steel, this Court authorized Gulf States Steel to enter into arrangements with trade vendors willing to provide Gulf States

Steel with certain levels of postpetition unsecured credit ("Preferred Trade Vendors") that provided Preferred Trade Vendors with, among other things, a superpriority claim (junior in priority to that of Ableco) and a lien on the collateral of the Indenture Trustee senior in priority to the lien of the Indenture Trustee (the Indenture Trustee and representatives of the holders of the Secured Mortgage Notes also consented to the subordination of the Indenture Trustee's lien to that of the Preferred Trade Vendors). The parties estimate that the current amount of the Preferred Trade Vendor liens is approximately $7.5 million. The liens in favor of the Preferred Trade Vendors were "collection liens" in that substantial restrictions were placed the ability of the Preferred Trade Vendors to collect upon those liens.

3. Gulf States Steel continued to operate its steel making facilities as a debtor in possession until approximately August of 2000. Prior to that time Gulf States Steel proposed a plan of reorganization that was dependent upon Gulf States Steel obtaining new financial facilities partially guarantied by the U.S. Government pursuant to the Emergency Steel Loan Guarantee Act of 1999. Gulf States Steel and its proposed lender applied for such a government guaranty. The Emergency Steel Guarantee Loan Board declined to approve a government guarantee.

4. On August 2, 2000, Gulf States Steel filed with this Court its notice of intent to discontinue further operations and commenced limited wind-down operations to complete work in process to finish product.

5. In November of 2000, debtor's chapter 11 case was converted to a chapter 7 case and James Henderson was appointed the chapter 7 trustee.

6. On May 31, 2001, Ableco, acting as the senior secured lender to Gulf States Steel and pursuant to a power of attorney contained in the loan documents approved by this Court, submitted to the Etowah County Board of Equalization (the "Board of Equalization") its objection to the valuation of all the Debtor's real and personal property for the purposes of assessing property taxes (the "May 2001 Objection"). Pursuant to the May 2001 Objection, Ableco objected to the valuation of the real and personal property for tax years 1999, 2000 and 2001.

7. By letter dated September 7, 2001, the Board of Equalization sent to counsel for Ableco their records on values for the Debtor's property for tax years 1999, 2000 and 2001. Based on the records transmitted with such letter, the Board of Equalization maintained the following values for the Debtor's property: 1999 Real Property—$104,497,212, 1999 Personal Property—$187,234,658, 2000 Real Property—$41,617,183, 2000 Personal Property—$177,446,229, 2001 Real Property—$41,095,747, and 2001 Personal Property—$165,568,098.

8. On May 31, 2002, Ableco submitted to the Board of Equalization its objection to the valuation of all the Debtor's real and personal property for the purposes of assessing property taxes. Pursuant thereto, Ableco objected to the valuation of the real and personal property for tax year 2002, restated the status of the May 2001 Objection and requested that the Board of Equalization notify Ableco of an appropriate time to meet or discuss the objections. The Board of Equalization has postponed all proceedings in connection with such objections and the same have not been resolved.

9. In May of 2001, this Court approved the sale by public auction of numerous items of equipment and the sale by private sale of certain real property and equipment used primarily in the manufacture of steel beams for the mobile home industry (the "Beam Mill") pursuant to Section 363 of the Bankruptcy Code.

10. On July 3, 2002, the Trustee filed the Sale Motion seeking authorization to consummate a sale of approximately 600 acres of real property on which the debtor's former steel operations were located (carving out from the real property to be purchased, among other real property, the real property underlying the coke ovens and melt shop) and substantially all of the debtor's remaining fixtures, plant and equipment (including the plate mill, the hot roll mill, and the cold roll mill). These assets are further described in the Sale Motion and are referred to herein as the "Steel Mill Assets". This proposed sale was to Gulf States Reorganization Group ("GSRG") for a purchase price of $5 million pursuant to an Asset Purchase Agreement or, alternatively, to the highest bidder pursuant to bidding procedures to be prescribed by the Court. The terms of the Asset Purchase Agreement and the specific bidding procedures were drafted by representatives of the Ableco and GSRG.

11. The Court set an initial hearing on the Sale Motion for August 21, 2002, to consider bidding procedures and other matters. The Court also requested the Trustee and any other parties supporting the Sale Motion to provide further briefing on the issue of the Trustee's ability to sell the Steel Mill Assets free and clear of liens and other interests under § 363 given that the Steel Mill Assets are fully encumbered by the liens asserted against the Steel Mill Assets.

12. On August 19, 2002, Gadsden Industrial Park, LLC (hereinafter "Park") filed its Objection of Gadsden Industrial Park, LLC, a Potential Bidder, to Trustee's Motion for an Order Establishing Bidding Procedures (the "Park Objection") in which Park asserted that competing bids should not be required to be identical in form and as to the assets being purchased in order to be considered by the Trustee.

13. At the August 21, 2002, hearing, the Trustee presented documentary exhibits and testimony on the liens appearing of record against the Steel Mill Assets, the negotiations between Ableco and GSRG for the purchase and sale of the Steel Mill Assets, and the factors considered by the Trustee in agreeing to certain of the bidding procedures to which objection was made by parties in interest. The proposed bidding procedures provided that competing bidders could only modify the GSRG/Trustee purchase and sale agreement by replacing the name of the purchaser with that of the competing bidder and by increasing the sales price. Ableco and two competing bidders, Gadsden Industrial Park LLC (a newly formed Delaware limited liability company) and Palini e Bertoli (an Italian firm in the steelmaking business) objected to such restrictions being placed upon competing bidders. The Trustee defended this provision on the grounds that requiring identical competing bids would assist the Trustee in determining the highest and best bid.

14. On August 26, 2002, Court entered its Order granting Trustee's Motion For An Order Establishing Bidding And Other Procedures In Connection

With Sale Of The Estate Free And Clear Of Liens And Other Interests (the "Bidding Procedure Order"). In the Bidding Procedures Order, the Court concluded that the Trustee failed to present sound business reasons why the Court should not allow bids as proposed by Park and that identical bids were not required for the Trustee to make a determination as to which bid is the highest and best bid to recommend to the Court for approval. The Bidding Procedures Order approved other bidding procedures as presented.

15. In addition to other procedures, the Bidding Procedures Order established a bid submission deadline of September 12, 2002 and in the event of at least one qualified bid, the Trustee would conduct an auction at 10:00 a.m. on September 16, 2002. The Bidding Procedure Order further approved the proposed procedure that "[a]t the Auction, all qualified bidders shall be given the opportunity to revise and submit increased Bids so long as the increased Bid or Bids is at least $50,000 higher than the then existing highest or better Bid. Such bidding shall continue until the Trustee concludes the Auction, which the Trustee may elect to do at anytime if no increased Bid has been submitted to the Trustee or his designee within thirty (30) minutes from the submission of the last increased Bid." Finally, the Bidding Procedure Order provided for the final hearing on the Sale Motion.

16. Pursuant to the terms of the Bidding Procedure Order, the Trustee provided notice of the auction and the final hearing on the Sale Motion to all creditors of the Gulf States Steel estate, as well as known competing bidders for the Steel Mill Assets, all entities claiming a lien or other interest in the Steel Mill Assets, state and federal environmental authorities, and all parties requesting special notice and published such notice in the national edition of the Wall Street Journal once a week for two weeks prior to the auction.

17. On September 12, 2002, Park timely submitted its bid in the amount of $5,250,000 (the "Park Bid") in conformance with the procedures set forth in the Bidding Procedures Order. No competing bid was submitted by Palini e Bertoli.

18. The Park Bid is substantially similar to the GSRG bid except for the proposed increased sale price as required pursuant to the Bidding Procedures Order and provisions which permit Park to purchase less property of the estate than GSRG proposed to purchase as expressly permitted by the Bidding Procedures Order.

19. As there was at least one qualified Overbid for the property (Park), pursuant to the Bidding Procedures Order, an auction was held at the debtor's plant site on September 16, 2002.

20. The Trustee received twenty-two cash bids with the last all-cash bid being that of Park in the amount of $6.3 million.

21. GSRG then tendered a bid purporting to be in the amount of $7 million dollars. The bid went on state the "amounts required by Ableco in order to pay Ableco in full and to comply with the terms of the Court's order on the Motion to Amend Compensation Agreement between the Trustee and Ableco will be paid in cash at closing, and the balance of the Purchase Price shall be offset (credited) from the allowed secured claim held by GSRG, to the extent allowed by

Title 11 U.S.C. § 363(k)." The bid did not specify a monetary figure to pay Ableco in full and meet the requirements of the Order on the amended compensation agreement between the Trustee and Ableco. The bid did not include any authorization of a credit bid by the Indenture Trustee, the holder of the mortgage which benefits bondholders, of whom GSRG represents approximately 15% ($30 million of the total $190 million).

22. Park objected to this bid as being too indefinite for Park to respond, as not being an all-cash bid as contemplated by the Bidding Procedures Order, and as proposing an off-set or credit in violation and in contravention of the priority provisions of the Bankruptcy Code. Due to several claims with higher priority than the bondholders, Park objected stating § 363(k) does not authorize an offset as proposed in the GSRG bid.

23. The Trustee rejected the GSRG Credit Bid on the grounds that it was not an all-cash offer, the dollar amount of the cash component of the bid was unclear, and the Trustee did not feel that he had the authority to determine whether GSRG had the right to credit bid or the value of that credit bid. The Trustee extended the time within which GSRG could submit an unqualified cash bid in excess of that of Park.

24. After being given several opportunities to tender an unqualified cash bid in excess of the last bid received from Park in the amount of $6.3 million, GSRG declined to submit any further unqualified cash bid.

25. Park asserted on the record that had GSRG submitted a further unqualified cash bid, it was ready, willing, and able to continue with the bidding process on a cash bid basis.

26. At the final hearing on the Sale Motion the Trustee reported that he proposed to accept the unqualified cash bid of Park in the amount of $6,300,000 as the highest bid received at the auction which conformed with the Bidding Procedures Order, and the best bid using his best business judgment.

27. On September 11, 2002, the City of Gadsden delivered to the Trustee a letter dated September 9, 2002 (the "City Letter"), objecting to the alterations made to the bidding procedures by the Court as a result of the August 21, 2002, hearing and reflected in the Bidding Procedure Order. Trustee's Exhibit A. The City Letter was delivered to each of the potential competing bidders on September 11, 2002. The City Letter was never filed with the Court. The Trustee presented the City Letter at the final hearing on the Sale Motion as an additional, unfiled objection to the Sale Motion.

28. On September 12, 2002, certain bondholders some of whom established GSRG (the "Objecting Bondholders") filed an objection and brief in opposition to a sale to any bidder other than GSRG. The Objecting Bondholders assert that the limitations of § 365(f), the *Dewsnup* decision, and the takings clause of the Fifth Amendment compel the conclusion that the Objecting Bondholders (and presumably all other bondholders receiving benefits from the Secured Mortgage Notes, along with all lienholders) must affirmatively consent to any sale of the Steel Mill Assets that does not pay their claims in full.

29. The Bondholders hold only a portion of the bonds secured by the Steel Mill

Assets and the Indenture Trustee of the bond issue has not objected to the Sale Motion or the Sale Order. The Objecting Bondholders have no authority to speak for all the bondholders. The secured mortgage notes which benefit the bondholders are controlled by State Street Bank and Trust Company, as the Indenture Trustee.

30. On September 13, 2002, the United Steel Workers of America filed a pleading urging the Court to consider factors other than the sales price in determining the highest and best bid. Such factors would include impact upon the community, the creation of jobs and environmental concerns.

31. At the final hearing on the Sale Motion, GSRG filed a "Motion For Order Compelling Trustee To Accept Bid of Gulf States Reorganization Group, Inc." (the "GSRG Motion to Compel") and an "Objection of Gulf States Reorganization Group, Inc. To Consideration of Bid by Gadsden Industrial Park, LLC And Motion to Disallow the Same" (the "GSRG Disallowance Motion").

32. In the GSRG Disallowance Motion, GSRG asserts that Gadsden Industrial Park, LLC failed to comply in numerous ways with the Bidding Procedures Order. Among other things, GSRG alleges that the modified purchase and sale agreement tendered by Gadsden Industrial Park, LLC (the "Modified Contract"):

A. Added a paragraph allowing Gadsden Industrial Park, LLC to take title to less than all of the Steel Mill Assets (the Court notes that this paragraph is entirely consistent with the changes made to the bidding procedures as a result of the August 21, 2002, hearing and reflected in the Bidding Procedures Order);

B. In its letter to the Trustee accompanying the Modified Contract, Gadsden Industrial Park, LLC states that the language in the Modified Contract that the sale be "free and clear of all liens, claims, encumbrances and other interests" includes any claim of any governmental agency even though no language to this effect is included in the Modified Contract;

C. In its letter to the Trustee, Gadsden Industrial Park, LLC states that its bid is conditioned upon "such other conditions as Gadsden or the Bankruptcy Court may determine are necessary to close the Transaction" including specific conditions precedent such as obtaining all necessary governmental and third party consents and approvals; and

D. Increased the time for the purchaser to close the transaction from 60 days after entry of an order approving the sale to at least 70 days thereafter.[1]

---

1. GSRG also speculated, with the benefit of no admissible evidence, that the Gadsden In-

dustrial Park, LLC bid is financialy backed by Nucor Corporation in an attempt to

33. GSRG argued that the Park bid must be rejected outright because of these and other reasons, or approval of the bid must be deferred pending further proceedings of the Court.

34. At the final hearing on the Sale Motion, ICON Receivables 1988–A, Inc. (ICON) restated its limited objection with respect to the sale of a Mesta Roll Grinder ("Mesta Grinder") in which ICON asserts an uncontested purchase-money security interest. Ableco acknowledged ICON's first priority position with respect to that equipment, and Park acknowledged that equipment does not constitute any part of the Steel Mill Assets it proposes to purchase.

35. Park is a good faith purchaser pursuant to 11 U.S.C. § 363(m); and Park is not a successor in interest to the debtor or the Trustee.

36. Notice of the Sale Motion and the final hearing thereon was appropriate under the circumstances.

37. The sale of the Steel Mill Assets in the manner set forth herein will maximize the sale proceeds to be received by the debtor's estate in connection with the sale of the Steel Mill Assets and is in the best interests of the debtor's estate and creditors of the estate.

### Conclusions of Law

Pursuant to 11 U.S.C. § 363(f) the trustee may sell property of the estate "free and clear of any interest in such property of an entity other than the estate, only if— (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; ... (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." 11 U.S.C. § 363(b), (f). Since the five conditions listed in 11 U.S.C. § 363(f) are phrased in the disjunctive, property may be sold free and clear of interests if any one of the five conditions is satisfied. *In re WBQ Partnership,* 189 B.R. 97 (Bankr.E.D.Va.1995).

The Trustee seeks permission to sell the property free and clear pursuant to § 363(f)(2), (4) and (f)(5). As stated above, (f)(2) allows a sale free and clear if the lienholder or interest holder consents to the sale. Ableco, the first priority lienholder has consented to the Sale Motion. The Trustee may therefore sell the Steel Mill Assets free and clear of this lien under § 363(f)(2).

Likewise, the Revenue Commissioner, as agent for the State of Alabama and Etowah County submitted a pleading consenting to the Sale Motion on the condition that the liens of such taxing authority attach to the proceeds of sale. (Doc. No. 1413).

█ The Preferred Trade Vendors are deemed to have consented to the Sale Motion (actively supported by Ableco) by virtue of the provisions of the Preferred

---

preempt any additional competition in the hot rolled steel market dominated by Nucor. GSRG further asserts that Nucor has a clear monopoly position on hot rolled sheet steel in the Southeastern United States. In the absence of any evidence to support GSRG's as-

sertion, and with no opportunity or forum for Nucor to defend against these antitrust allegations, the Court sees no basis to entertain GSRG's assertions that any sale to Gadsden Industrial Park, LLC would violate applicable antitrust laws.

Trade Vendor Order (the Preferred Trade Vendors may not "contest, object to or otherwise dispute the valuation of collateral subject to the Trade Collection Lien, or any other action that holders of senior liens may take with respect to such collateral ...."). The Trustee may therefore sell the Steel Mill Assets free and clear of this lien under § 363(f)(2).

■ Bankruptcy Code Section 363(f)(4) allows a sale to proceed free and clear of any interest if the interest is in bona fide dispute. The purpose of § 363(f)(4) is to permit property of the estate to be sold free and clear of interests that are disputed by the estate "so that liquidation of the estate's assets need not be delayed while such disputes are being litigated." *In re Clark*, 266 B.R. 163, 171 (9th Cir. BAP 2001)(citing 3 Lawrence P. King, *Collier on Bankruptcy* ¶ 363.06 (15th ed. rev. 1998)).

■ The trustee bears the burden of showing that a bona fide dispute exists. *See In re Terrace Chalet Apartments, Ltd.*, 159 B.R. 821, 828 (N.D.Ill.1993) (citing *In re Octagon Roofing*, 123 B.R. 583, 590 (Bankr.N.D.Ill.1991)). Property may be sold free and clear of a lien when the dispute involves third parties. *In re Gerwer*, 898 F.2d 730, 733 (9th Cir.1990) (bona fide dispute need not be between the debtor or trustee and lienholder, but rather, if the outcome of dispute over interest will affect value of estate, statutory language is sufficient to embrace interest).

■ The term "bona fide dispute" is not defined in the Bankruptcy Code. *See In re Octagon Roofing*, 123 B.R. 583, 590 (Bankr.N.D.Ill.1991); *In re Taylor*, 198 B.R. 142, 162 (Bankr.D.S.C.1996); *In re Collins*, 180 B.R. 447, 452 (Bankr.E.D.Va. 1995). However, this term is used both is § 363(f)(4) and § 303(b). 11 U.S.C. §§ 303 and 363. Courts interpreting § 363(f)(4)

have consistently held that for a bona fide dispute to exist the court must determine "whether there is an objective basis for either a factual or legal dispute as to the validity of the debt." *In re Octagon Roofing*, 123 B.R. at 590; *In re Bedford Square Associates*, 247 B.R. 140, 145 (Bankr. E.D.Pa.2000) (although the debtor had not commenced a strong-arm proceeding to avoid a provision from a shopping mall lease, the fact that it could was sufficient to establish a "bona fide dispute"); *In re Olympia Holding Corp.*, 129 B.R. 679, 681 (Bankr.M.D.Fla.1991); *Collins*, 180 B.R. at 452 (there must be "an objective basis for either a factual or legal dispute as to the validity of the debt"); *Taylor*, 198 B.R. at 162.

Additionally, courts interpreting the term "bona fide dispute" as it applies to § 303(b) have consistently held that a "bona fide dispute" exists when "there is an objective basis for either a factual or a legal dispute as to the validity of debt." *In re Busick*, 831 F.2d 745, 750 (7th Cir. 1987). *See also In re Atlas Machine & Iron Works v. Bethlehem Steel*, 986 F.2d 709 (4th Cir.1993) (bona fide dispute exists where there is a meritorious existing conflict as to creditor's right to payment); *Atwood*, 124 B.R. at 407 (bona fide dispute exists if "there is either a genuine issue of material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts."); *In re Leach*, 92 B.R. 483, 487 (Bankr.D.Kan.1988) (same); *In re Ramm Industries, Inc.*, 83 B.R. 815, 823 (Bankr. M.D.Fla.1988) (same).

■ While courts require evidence that shows that there is an "objective basis" for the dispute, the court is not required to determine the underlying dispute or determine the probable outcome, rather only that a dispute does in fact exist. *See*

**508**

*Octagon Roofing,* 123 B.R. at 590; *Taylor,* 198 B.R. at 162; *Collins,* 180 B.R. at 452.

■ As stated in the Findings of Fact above, a valid legal and factual dispute exists as to any taxes owed based upon the filed objections to the assessed values of the Property. Accordingly, pursuant to 11 U.S.C. § 363(f)(4) this sale will be allowed to proceed pursuant to the Sale Motion over any objection by any Taxing Authority.

■ Section 365(f)(5) provides that the Trustee may sell the Property free and clear of any interest if the holder of that interest "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." 11 U.S.C. § 363(f)(5); *see, In re P.K.R. Convalescent Centers, Inc.,* 189 B.R. 90 (Bankr.E.D.Va. 1995) (allowing the sale of nursing home assets under § 363(f)(5) over objection where interest was reducible to a claim and subject to a hypothetical money satisfaction). By its express terms, Section 363(f)(5) permits a sale free and clear "if the trustee can demonstrate the existence of another legal mechanism by which a lien could be extinguished without full satisfaction of the secured debt." *In re Terrace Chalet Apartments, Ltd.,* 159 B.R. 821, 829 (N.D.Ill.1993) (finding that Section 1129(b)(2) cram down is such a provision in Chapter 11).

Some courts that have addressed Section 363(f)(5) overlap their discussions with the provisions of Section 363(f)(3). *See AG Van Metre, supra; In re Canonigo,* 276 B.R. 257 (Bankr.N.D.Cal.2002); *In re Beker Industries Corp.,* 63 B.R. 474 (Bankr. S.D.N.Y.1986). However, "Section 363(f)(5) would repeat Section 363(f)(3) if it were interpreted merely to require a specific amount of money that the trustee could pay in order to sell the property free and clear of a lien." *Terrace Chalet,* 159 B.R. at 829. Cases requiring full payment un-

der Section 363(f)(5) are "obsolete, inasmuch as [they are] inconsistent with the bankruptcy code." *In re Grand Slam, U.S.A., Inc.,* 178 B.R. 460, 462 (E.D.Mich. 1995); *Healthco Int'l,* 174 B.R. at 176 (since any lien can be discharged by full payment of the underlying debt pursuant to § 363(f)(3), it makes no sense that § 363(f)(5) requires full payment); *Terrace Chalet,* 159 B.R. at 829 (decisions which require full payment of liens absent a showing of equitable consideration renders § 363(f)(3) superfluous).

■ Section 363(f)(5) does not require that the sale price for the Property must exceed the value of the interests, but rather, only that the mechanism exists to address extinguishing the lien or interest without paying such interest in full. *Grand Slam,* 178 B.R. at 463. The phrase "could be compelled" only requires "that the interest in question be subject to final satisfaction on a hypothetical basis, not that there be an actual payment in satisfaction of the interest from the proceeds of the sale in question." *Healthco Int'l,* 174 B.R. at 176. Even if an actual payment were required, the lienholder would only be entitled to receive what it would receive in the event of a cram-down. Here, due to the size and nature of the Ableco lien, the indubitable equivalent as required in 11 U.S.C. § 1129(b)(2)(A)(iii) would be nothing. Like "cram downs" in Chapter 11 cases, "Section 724(b) compels lien creditors in appropriate cases to accept a money satisfaction of their interests by the payment of less than the full amount of the debt." *Grand Slam,* 178 B.R. at 463.

■ In this case, each of the claims, liens or interests identified in the Sale Motion could be compelled to accept a money satisfaction in a cram down plan of reorganization in a Chapter 11 case. Moreover, the DIP Financing Orders pro-

vide that Ableco has a lien on the Property that is senior in priority to such claims, liens or interests. Thus, the holders thereof would be compelled as a matter of law to release the same in a judicial or non-judicial foreclosure of the senior liens held by Ableco. *See* Ala.Code § 35–10–5.

In addition, with respect to the claims of the Taxing Authorities, Bankruptcy Code Section 724 dictates that the Taxing Authorities can be compelled to accept a money satisfaction of their interest. Like the cram down provision in § 1129(b)(2), "[s]ection 724(b) compels lien creditors in appropriate cases to accept a money satisfaction of their interests by the payment of less than the full amount of the debt." *Grand Slam*, 178 B.R. at 463–4. *See also Healthco Int'l*, 174 B.R. at 177 (Section 724(b) allows the court to compel a taxing authority to accept "money satisfaction" of its tax lien by payment of less than the full amount of tax debt, such that property could be sold free and clear of the taxing authority's tax lien); *In re A.G. Van Metre, Jr., Inc.*, 155 B.R. 118 (Bankr.E.D.Va. 1993), *aff'd without opinion*, 16 F.3d 414 (4th Cir.1994) (full satisfaction of a statutory tax lien against property was not required as a condition to the approval of a Chapter 7 trustee's sale of the property free and clear of all liens).

The foregoing is consistent with the sale free and clear ordered by this Court in connection with the prior Section 363 sales of the beam mill and the many assets offered at public auction in May, 2001.

The Bondholders objections on Fifth Amendment and *Dewsnup* grounds are due to be overruled.[2] In *Dewsnup v. Timm*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992), the debtors were the owners of farmland encumbered by a deed of trust securing a debt that was far in excess of the value of the property. The debtors defaulted and, before the holder of the deed of trust could foreclose, filed for bankruptcy relief under Chapter 11 of the Bankruptcy Code. This initial petition was dismissed and the debtors later filed for relief under Chapter 7 of the Bankruptcy Code. The debtors sought to have the bankruptcy court, pursuant to § 506(a), value the property at its fair market value which was substantially less than the amount owed to the secured creditor. This amount reflected a steep decline in the general market value of farmland in that area. In conjunction with § 506(a), the debtors also sought to use § 506(d) to "strip down" the secured creditor's lien by reducing the amount of the debt secured by the lien to the judicially determined value of the property. The intended effect to the lien holder was that, if the lien could be "stripped down" to the judicially determined value, the secured creditor would lose the benefit of any "appraisal error" in the judicially determined value as well as any subsequent market increase in the value of the property in any subsequent

---

**2.** There is some question as to whether the Court should even consider the objections of the bondholders. These are not objections by secured creditors concerning sale of their collateral. Considering the nature of their claims, these objections may not even be objections of creditors, much less secured creditors. The objecting bondholders acknowledge in their Motion that the Indenture Trustee is the holder of the mortgage, and that they are mere holders of beneficial interests arising out of the rights of the Indenture Trustee. These bondholders have no direct claim or enforceable interest in this case. Only the Indenture Trustee has standing to assert these objections on behalf of the bondholders and the Indenture Trustee has made no appearance in opposition to the sale. As such, the objection by the bondholders could be deemed as merely a statement as to their recommendation to whom the Trustee should approve. Nevertheless, the Court addresses the objections in order to fully consider all perspectives.

foreclosure action. Thus, if the lien were effectively "stripped down" to the judicially determined value, then any amount of the subsequent sales price that exceeded the judicially determined value would be distributed to the debtor or the other unsecured creditors instead of the secured creditor.

The Court in *Dewsnup* hinted that a possible Fifth Amendment violation may exist if it allowed the lien stripping due to the "post-stripping" appreciation of collateral. It stated that:

> [t]he practical effect of petitioner's argument is to freeze the creditor's secured interest at the judicially determined valuation. By this approach, the creditor would lose the benefit of any increase in the value of the property by the time of the foreclosure sale. The increase would accrue to the benefit of the debtor, a result some of the parties would describe as a windfall.

> We think, however, that the creditor's lien stays with the real property until the foreclosure. That is what was bargained for by the mortgagor and the mortgagee.... any increase over the judicially determined valuation during bankruptcy rightfully accrues to the benefit of the creditor and not to the benefit of other unsecured creditors whose claims have been allowed and who had nothing to do with the mortgagor-mortgagee bargain.

*Dewsnup v. Timm,* 502 U.S. 410, 417, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992). Thus, the *Dewsnup* court avoided a potential Fifth Amendment problem by interpreting § 506(d) as not authorizing "lien stripping." While expressly limiting its opinion to the facts before it [3], the Supreme Court

in *Dewsnup* held that § 506(d) voids liens on the basis of whether the underlying claim is allowed or disallowed under § 502. *Dewsnup v. Timm,* 502 U.S. 410, 415–7, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992); see also 4 COLLIER ON BANKRUPTCY ¶ 506.06[1][a] (Lawrence P. King ed., 15th ed. rev.1998) (this interpretation makes a great deal of sense because it is consistent with the legislative history, it is consistent with the exceptions set forth in § 506(d)(1) and (2), and it allowed the Court to avoid a potential Fifth Amendment problem).

As Justice Scalia indicates in his dissent, the *Dewsnup* court reached its conclusion by a questionable construction of § 506(d). The Court determined that § 506(d) does not void liens on the basis of whether they are secured under § 506(a), but rather on the basis of whether the underlying claim is allowed or disallowed under § 502.

The *Dewsnup* majority based its textual analysis on two premises. First, it explained that § 506(a) is not a definitional section and therefore, the words "allowed secured claim" do not have to mean the same thing in § 506(d) as they do in § 506(a). 502 U.S. at 417, 112 S.Ct. 773. Second, the court explains that the legislative history of § 506(d) indicates that its purpose was to permit liens to pass through bankruptcy unaffected. 502 U.S. at 418, 112 S.Ct. 773.

Section 506(a) is based upon a "priority" concept of security. Under the "priority" concept of security, "security" means a right not to a specific piece of collateral, but simply a right to be paid first to the extent of the value of the collateral. *See* Douglas G. Baird & Thomas H. Jackson, *Corporate Reorganizations and the Treatment of Diverse Ownership Interests: A*

---

**3.** "Hypothetical applications that come to mind and those advanced at oral argument illustrate the difficulty of interpreting the statute in a single opinion that would apply to all possible fact situations. We therefore focus upon the case before us and allow other facts to await their legal resolution on another day." 502 U.S. at 416–417, 112 S.Ct. 773.

*Comment on Adequate Protection of Secured Creditors in Bankruptcy,* 51 U. Chi. L.Rev. 97, 113–4 (1984) ("The secured creditor's ultimate remedy is to sell the asset and thereby realize the asset's value in the marketplace ... This definition of the secured creditor's remedy suggest that the probability of repayment and not any intrinsic interest in the collateral itself is the principal element of the value of his bargain with the debtor."); Charles A. Shanor, *A New Deal For Secured Creditors In Bankruptcy,* 28 EMORY L.J. 587, 595 n. 39 (1979) ("The Code's focus on the value of the secured party's claim rather than on the security itself is a substantial change from both the Act and the U.C.C.").

The Bondholders support their argument that the Steel Mill Assets may not be sold without their express consent by citing the opinion of Justice Brandeis in *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935). The Frazier–Lemke statute which *Radford* held unconstitutional contained a peculiarity. The statute created a uniform five year plan of reorganization for farm loans in default, reducing the lien and payment on that lien to the appraised fair market value of the farm. By its terms the statute and its standard plan were strictly limited to liens in existence as of the effective date of the statute. Justice Brandeis had no problem holding that Congress could *not* impair liens in existence as of the effective date of the passage of lien modification legislation without violating the Fifth Amendment. Justice Brandeis held that "[b]ecause the act is retroactive, in terms, and, as here applied, purports to take away rights of the mortgagee in specific property, [the Fifth Amendment] is controlling." *Id.* at 589, 55 S.Ct. 854. Since § 363(f) is not retroactive in its application, *Radford* is not applicable.

■ Furthermore, *Radford* has been seriously eroded if not overruled by *Wright v. Vinton Branch of Mountain Trust Bank,* 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736 (1937) (holding that the second Frazer–Lemke Act, which was almost identical to the Act invalidated in *Radford,* was constitutional); *see also Helvering v. Griffiths,* 318 U.S. 371, 401 n. 52, 63 S.Ct. 636, 87 L.Ed. 843 (1943) (stating that the Supreme Court reexamined and corrected the "error" of *Radford* by its holding in *Vinton Branch*); *In re A.V.B.I., Inc.,* 143 B.R. 738, 746 (Bankr.C.D.Cal.1992) (noting that *Radford* had fallen into disrepute and was of doubtful continued vitality). Cases discussing *Radford* correctly explain that lien avoidance under the federal bankruptcy power does not come within the traditional definitions of taking under the Fifth Amendment. *In re Pillow,* 8 B.R. 404, 411 (Bankr.D.Utah 1981) (holding that § 522(f), bankruptcy code section governing avoidance of liens on property, does not violate the takings clause of the Fifth Amendment). The Fifth Amendment protects a creditor's rights only to the extent of its interest in the collateral as that interest is defined by the bankruptcy laws. *Travelers Ins. Co. v. Bullington,* 878 F.2d 354, 359 (11th Cir.1989) (holding that § 506 application to reduce under-secured creditor's allowed claim to value of collateral for purposes of § 1225(a)(5) withstands Fifth Amendment challenge).

In applying § 363, the bankruptcy courts determine whether the property interests of third parties are adequately protected through consent or compensation. *See Ultimate Sportsbar, Inc. v. United States,* 48 Fed.Cl. 540 (2001); Bankruptcy Reform Act of 1978, S. Rep. 95–595, at 49–57 (1978), reprinted in 1978 U.S.C.A.A.N. 5787, 5835–43. The concept of adequate protection is derived from the fifth amend-

ment protection of property interest as enunciated by the Supreme Court. *See Wright v. Union Central Life Ins. Co.*, 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940); *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935).

Holding that the avoidance of a lien under § 506(d) would violate the Fifth amendment pursuant to due process or takings grounds would "call into question the entire history of lien avoidance in bankruptcy as well as the entire framework of the Code. The fact that due process and lien avoidance have coexisted since the Sixteenth Century, with the momentary aberration of Radford, requires the conclusion that [§ 506(d)] does not offend the [Fifth Amendment.]" *In re Yi*, 219 B.R. 394 (E.D.Va.1998), citing *In re Pillow*, 8 B.R. 404, 424 (Bankr.D.Utah 1981).

As the Seventh Circuit has held, "not every prospective diminution in the rights of creditors can be an unconstitutional taking; for such a conclusion would come close to nullifying the Constitution's bankruptcy clause." *In re Thompson*, 867 F.2d 416, 422 (7th Cir.1989). Clearly, in conducting any analysis of the Fifth Amendment takings clause as applied to the Bankruptcy Code, consideration must be given to the bankruptcy clause contained in Article I, section 8 of the Constitution.

Thus, a sale free and clear of interests under § 363(f)(5) can be reconciled with the Supreme Court's opinion in *Dewsnup*, especially under the facts in this case. First and foremost, the *Dewsnup* majority went out of its way to make clear that the holding was limited to the facts before it. See Footnote 2 supra. Given that the Court was concerned that its holding not be applied even to other issues arising under § 506(a) or (d), it seems clear that the holding should not be exported to sales under § 363(f)(5).

Second, even though *Dewsnup* is still binding precedent, it has not received much acclaim. In fact, it has almost been universally criticized by the commentators. *See* A.W. Bailey III, *Dewsnup v. Timm: Judicial Sleight of Hand in Statutory Construction of the Bankruptcy Code*, 319 BYU Journal of Public Law (1993); Robert M. Lawless, *Legisprudence Through a Bankruptcy Lens: a Study in the Supreme Court's Bankruptcy Cases*, 47 Syracuse Law Review 1 (1996); and Walter A. Effross, *Grammarians at the Gate: the Rehnquist Court's Evolving "Plain Meaning" Approach to Bankruptcy Jurisprudence*, 23 Seton Hall Law Review 1636 (1993). Needless to say, with as much criticism as *Dewsnup* has garnered, this Court would be unwilling to expand it beyond its narrow scope.

Third, the gravest concern expressed by the *Dewsnup* Court was the fact that the interpretation of § 506(d) that would authorize lien stripping would lead to situations where the collateral of secured creditors would be taken away from the secured creditor and redistributed to the debtor or unsecured creditors. In a § 363 sale of collateral, however, that does not occur. There is no judicial determination of value, there is no judicial reduction in the value of the lien or the extent to which the lien attaches to the collateral. Instead, the value is determined by the marketplace, the collateral is reduced to cash proceeds (in most cases), and the lien attaches to the proceeds to the same extent and with the same priority that the lien attached to the collateral. There simply is no economic impairment to the holder of an undercollateralized lien as a result of a § 363 sale of the collateral and there is no taking of any economic property from the secured credi-

tor that could possibly support a constitutional taking claim.

Fourth, the lien stripping prohibited by *Dewsnup* has no corollary in bankruptcy or non-bankruptcy law. To the contrary, the minor alterations of the rights of secured creditors effected by § 363(f)(5) can only be accomplished if the same thing could happen to the secured creditor under established bankruptcy or non-bankruptcy law ("such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."). How could an undersecured creditor claim an unlawful taking if the creditor were paid the same thing in a foreclosure sale by a senior secured creditor or under a plan of reorganization? Clearly, this limitation and the other aspects of a § 363(f)(5) sale of collateral provide a secured creditor with adequate protection of its interests and substantive and procedural due process.

Fifth, even if a secured creditor were to assert that § 363 affects an unconstitutional taking of property without due process of law, such an assertion ignores the due process rights embodied in the Bankruptcy Code in general and in § 363 in particular. A secured creditor is accorded procedural due process by the notice and hearing provisions of the Bankruptcy Code applicable to § 363, as well as rights of appeal, etc. As discussed above, substantively, the secured creditor is entitled to a replacement lien upon the proceeds of the collateral. Any secured creditor asserting such a claim would have to explain why the battle-tested concepts of notice, opportunity for a hearing, and adequate protection in the form of replacement liens, does not

provide ample due process for any such imagined taking.

Lastly, the process embodied in § 363 of removing liens from one form of collateral and granting replacement liens in another form of economically equivalent collateral is much closer to the universally accepted practice of providing secured creditors with adequate protection for the use, sale or lease of collateral by the trustee on the condition that the trustee provide the affected secured creditor with adequate protection of its interest in the collateral, than it is to the lien stripping prohibited in the *Dewsnup* case. If the *Dewsnup* prohibition on lien stripping were to be inappropriately expanded beyond the facts of the *Dewsnup* case and extended to § 363 sales on the theory that such a sale strips the undersecured creditor of its lien (of course, ignoring the replacement lien on the proceeds of the collateral), that same theory would dictate that authorizing the trustee to use cash collateral upon the condition that the secured creditor be provided with a replacement lien on economically equivalent collateral would also constitute lien stripping prohibited by *Dewsnup*. Such a theory and result is patently absurd [4].

The court's ruling is supported by the case of *In re Tanner*, 217 F.3d 1357 (11th Cir.2000) in which the Eleventh Circuit Court of Appeals joined with a majority of circuits in holding that a wholly unsecured home mortgage could be "stripped off" pursuant to a Chapter 13. Likewise, in *In re Paschen*, 296 F.3d 1203 (11th Cir.2002), the Eleventh Circuit Court of Appeals ruled that 11 U.S.C. § 1322(c)(2) permits Chapter 13 debtors to bifurcate undersecured short-term mortgages into secured and unsecured claims and "cramdown" the

---

**4.** In his dissent, even Justice Scalia branded the notion of the *Dewsnup* holding adversely affecting the ability of the trustee to sell property under § 363 free and clear of liens as being absurd, both at the beginning of his paragraph addressing this issue as well as at the end of such paragraph. 502 U.S. at 426–427, 112 S.Ct. 773.

unsecured portion of the claim under 11 U.S.C. § 1325(a)(5).

The Court notes that the objection of the City of Gadsden goes to matters which were resolved pursuant to the Bidding Procedures Order. Because the City has not filed its objection or any other response to the Bidding Procedures Order within ten days after the entry of the Bidding Procedures Order, the matters raised in the City Letter are moot and the Bidding Procedures Order constitutes the law of the case.

Further, the Court notes that no party has moved the Court to reconsider the rulings made in the Bidding Procedures Order, nor, to the Court's knowledge has any party commenced an appeal with respect to the same. Except for the limited change to permit competing bids to be substantially similar to the GSRG Agreement as opposed to identical, the bidding procedures drafted by Ableco and GSRG were approved.

To conclude, the Trustee has complied with the applicable provisions of § 363(f) and, with no *Dewsnup* limitation, the Trustee may therefore sell the Steel Mill Assets free and clear of liens and other interests under § 363(f).

Having established that § 363(f) authorizes the sale free and clear of the liens and other interests in such property, the Court now turns to the issue of whether the Trustee should be authorized by this Court to do so.

The Second Circuit established the leading authority for approving a sale in *Equity Sec. Holders v. Lionel Corp. (In re Lionel)*, 722 F.2d 1063 (2nd Cir.1983). In *Lionel,* the Circuit held the proper standard to use when considering a proposed motion to sell is the business judgment test. It is this standard which has been adopted by the vast majority of courts. *See also, U.S. ex rel. Rahman v. Oncology Associates, P.C.,* 269 B.R. 139 (D.Md.2001) (The standard to be applied by a court in determining whether or not to approve the disposition of property is whether the Trustee exercised sound business judgment.) Under this standard, the Trustee has the burden to establish sound business reasons for the terms of the proposed sale. Factors for the Court to consider in whether to approve the sale include: (1) any improper or bad faith motive, (2) price is fair and the negotiations or bidding occurred at arm's length, (3) adequate procedure, including proper exposure to the market and accurate and reasonable notice to all parties in interest. The Trustee is responsible for the administration of the estate and his or her judgment on the sale and the procedure for the sale is entitled to respect and deference from the Court, so long as the burden of giving sound business reasons is met. *In re Bakalis,* 220 B.R. 525, 531–32 (Bankr.E.D.N.Y.1998) (noting discretion accorded to trustee with regard to sale of assets).

The business judgment of the Trustee must be evaluated: (a) as to the propriety of the Sale Motion and the bid of GSRG embodied within the Sale Motion, (b) as to the preparation for and conduct of the auction, and (c) as to the Trustee's determination of the highest and best bid received.

The Court finds that the Trustee's decision to sell the Steel Mill Assets was sound given the fact that this is a Chapter 7 case and given the prior unsuccessful marketing of the Steel Mill Assets both by public auction in May of 2001 (at which time reserve prices were not met for these particular assets), and by informal sales efforts involving steel industry participants and bidders aware of the Steel Mill Assets

as a result of the marketing in connection with the May, 2001, public auction.

The Court finds that the Trustee's initial decision to sell the Steel Mill Assets to GSRG for the amount of $5 million was sound given the unsuccessful prior marketing efforts referred to immediately above, and given that the $5 million purchase price was roughly equivalent to the percentage of appraised value that was realized for the many assets that did sell in the May, 2001, public auction.

The Court finds that the Trustee complied with the notice and advertising procedures specified by the Court in the Bidding Procedures Order. The property was properly exposed to the marketplace thereby allowing maximization of interest in bidding on the assets.

The Court further finds that there was no collusion or bad faith motive on the part of the Trustee or any bidder in connection with the Sale Motion, and that all negotiations and bidding occurred at arms-length. The Court did note in the Bidding Procedures Order the close interconnection between Ableco, Gulf States Steel, and GSRG, but no party has suggested any collusion.

The auction was conducted as contemplated in the Bidding Procedures Order. Parties were allowed to submit initial bids with accompanying contracts, which were substantially similar to the contract with GSRG. At the auction, competing bids were made by two bidders, GSRG and Park.

GSRG, as stated in the findings of fact, objected to the qualifying bid of Park for a variety of reasons. The Court finds these objections are without merit. Park submitted its bid in conformance with the Sale Motion, the Bidding Procedures Order, and the bidding procedures prescribed therein. GSRG's objection to Park's qualified bid on the basis that Park's modified contract allowed them to exclude certain property the Trustee sought to sell is a red herring. The Court notes that this right was agreed to at the bidding procedures hearing. This understanding was included in the Bidding Procedures Order wherein this Court held "As clarification of such Bidding Procedures, the successful bidder may chose to take title to less than all of the Steel Mill Assets, without deduction from the price." Bidding Procedures Order ¶ 3. Thus, this objection is without merit.

Further, GSRG was not being required to take title to all of the debtor's remaining assets. They had already elected to "pick and choose" which property they wanted to keep and which property they wanted to leave to the trustee to be abandoned. Any requirement that any other bidder must take the same property as determined by GSRG defies logic. As GSRG could make an independent analysis of which property it desired, other parties could, and did, make their own determination. As long as the purchase price was not diminished by the selection, it was in the best interests of the estate to allow the potential bidders to determine to their own satisfaction which property they sought to purchase.

As for the other alleged deficiencies argued by GSRG to the Park bid, the Court points out these issues were not contained in the actual modified contract, but instead were mentioned in the letter to the Trustee accompanying the modified contract. See Trustee's Exhibit B. Even if the terms were in the modified contract, the Court finds the changes either de minimis, as with respect to the closing day from 60 to 70 days, or vague, as with respect to the mention of conditions of the Bankruptcy Court. As such, the Objection of Gulf

States Reorganization Group, Inc. to Consideration of Bid by Gadsden Industrial Park, LLC, and Motion to Disallow the Same is overruled and denied. Additionally, the determination of what constituted a qualifying bid was left to the sound discretion of the Trustee. Like the Court, the Trustee rejected these arguments by GSRG and this Court finds no abuse of discretion.

■ This takes us to the final issue to be determined by the Court, whether the Trustee exercised sound business judgment in the selection of the highest and best bid for the Steel Mill Assets. This determination is complicated by the various protests that have arisen out of the auction process and the fact that the Trustee was presented with the non-conforming GSRG Credit Bid.

The City of Gadsden, the Objecting Bondholders, the United Steel Workers of America and GSRG all urge that the Trustee and the Court look to factors other than benefit to the estate in determining the highest and best bid. They believe that factors such as the number of jobs created in the local community as a result of a given bid, the effect on the community of a given bid, environmental issues presented by the different bids, and the preferences of the local government of one bidder over another should be considered by the Court and the Trustee in addition to the purchase price and the benefit to the estate of one bid versus another.

The United Steel Workers of America cite cases in support of the above proposition. However, these cases, by and large, involve instances where courts have authorized the acceptance of the lower of competing bids because the lower bid provides greater benefit to the estate than the high-er bid. *See In re Bakalis, supra; In re After Six, Inc.,* 154 B.R. 876 (E.D.Pa.1993) (Court ordered highest dollar amount bid accepted despite committee's preference for a lower amount bid that included a promise to employ debtors' former employees).

■ Despite the concerns of City of Gadsden, the Objecting Bondholders, the United Steel Workers of America and GSRG, the Court reminds the parties, that the Trustee, not the Court, is selling this property. As stated in 11 U.S.C. § 704, one of the duties of the trustee is to "collect and reduce to money the property of the estate...." "In enacting the Bankruptcy Code, Congress expressed its specific intent that judges of the United States Bankruptcy Court should not participate in the administration of bankruptcy estates." *In re Landscape Properties, Inc.,* 100 B.R. 445, 447 (Bankr.E.D.Ark. 1988); *In re NEPSCO, Inc.,* 36 B.R. 25 (Bankr.D.Me.1983). As stated above, the Trustee has "great judicial deference" in deciding which bid to accept as the best and highest bid. *Bakalis,* 220 B.R. at 532. Even though the discretion is not without limit, a Court should not step in and assume a role and responsibility properly placed in the hands of the trustee.

As between the two bidders, Park and GSRG, the Bidding Procedures Order required overbids "at least $50,000 higher than the then existing highest or better Bid." The nonconforming bid by GSRG prevented the Trustee from determining if the bid exceeded the prior bid by $50,000, as required in the Bidding Procedures Order. Such a determination required facts not available to the Trustee, including the final amount of debt owed to Ableco and the full amount payable to the Trustee for commission and professional fees.

Furthermore, the non-conforming bid relied on an inapplicable statute. Since several claims have a higher priority than the claims held by GSRG, any application of an offset by § 363(k) would violate those priorities. In addition to paying Ableco in full, the claims of taxing authorities would have to be paid in full, along with the liens of the Preferred Trade Vendors, in the approximate amount of $7.5 million, before any proceeds could be applied to the mortgage debt.

Finally, as stated earlier, neither GSRG nor the Objecting Bondholders can act for the bondholders as a whole. Both these entities control only a portion of the bondholders. The Indenture Trustee is the record holder of the mortgage, and it did not join this specious proposal.

This leaves the $6.3 million bid of Park and a lower bid of GSRG. Between these bids, the Trustee chose the $6.3 million bid of Park. Obviously, this is the higher bid, allowing the best return for the estate. The United Steel Workers of America argue the Court, and presumably the Trustee, should not look at just the highest bid. This argument is made even after citing *In re Gil–Bern Indus., Inc.,* 526 F.2d 627 (1st Cir.1975) which held a trustee's duty is to maximize the return to a bankruptcy estate. *See also In re Bakalis,* 220 B.R. 525 (Bankr.E.D.N.Y.1998). The First Circuit, as does this Court, acknowledged that the "highest bid is not always the best bid." *Gil–Bern* at 629. However, this is not a situation where the higher bid has complications which might render it not the best bid. For example, in most respects the Park bid is almost identical to the GSRG bid, with respect to the benefit to the estate. The Park bid contains no contingencies which might render it less desirable to the estate than the GSRG bid. The Park bid will not take substantially

longer to consummate than the GSRG bid. Thus, from an estate point of view, the Court can find no abuse of discretion with the trustee's decision to accept the Park bid over the GSRG bid. Finally, most of the cases cited by the Steelworkers Union did not involve a court forcing a trustee or a debtor-in-possession to take a lower bid. *In re After Six Inc.,* 154 B.R. 876 (Bankr. E.D.Pa.1993) (court sustained debtor's decision to go with higher offer); *In re Bakalis,* 220 B.R. 525 (Bankr.E.D.N.Y.1998) (court sustained trustee's decision to go with lower bid). As held in *In re Landscape Properties, Inc.,* 100 B.R. 445 (Bankr.E.D.Ark.1988):

> In deciding whether to approve a purchase offer or in choosing which is the better offer when competing offers have been made, courts generally consider factors in addition to a higher dollar amount. It has been held, however, that in a liquidation case it is "legally essential" to approve the highest offer, although this statement assumes that the offers and offerors are in all other respects comparable.

*Id.* at 447 (citing *In re Flannery,* 11 B.R. 974, 977 (Bankr.E.D.Pa.1981)).

Here, from the perspective of the estate, these offers and offerors are in all respects comparable. As such, the Trustee's decision to accept the higher and better bid of Park is consistent with sound business judgment, and is due to be approved. *See Equity Sec. Holders v. Lionel Corp. (In re Lionel),* 722 F.2d 1063 (2nd Cir.1983).

### ORDER

For the foregoing reasons, it is by the Court hereby

**ORDERED, ADJUDGED AND DECREED:**

1. That the Sale Motion is due to be, and is hereby, **GRANTED.**

2. That the bid of Gadsden Industrial Park, L.L.C. for the Steel Mill Assets is the highest and best bid received by the Trustee; and the trustee's proposed sale of the Steel Mill Assets to Gadsden Industrial Park, L.L.C. free and clear of all liens, claims and other interests as specified in the Sale Motion and the Bidding Procedures Order for $6,300,000 is due to be, and is hereby, **APPROVED.**

3. The Trustee is hereby **AUTHORIZED, ORDERED, and DIRECTED** to consummate and close the sale of the Steel Mill Assets to Gadsden Industrial Park, L.L.C. pursuant to the Sale Motion and Bidding Procedures Order free and clear of all liens, claims and other interests as specified in the Sale Motion and the Bidding Procedures Order for $6,300,000.

4. Park is a good faith purchaser pursuant to 11 U.S.C. § 363(m); and Park is not a successor in interest to the debtor or the Trustee.

5. As specifically provided in the Bidding Procedures Order, Gadsden Industrial Park, L.L.C. may in its sole discretion elect, at any time prior to the consummation and closing of the sale of the Steel Mill Assets, to exclude any portion of the Steel Mill Assets from the sale and shall not be required to purchase any such excluded items; provided, however, that the purchase price shall remain fixed at $6,300,000 and shall not be adjusted in response to any such election to exclude any items from the sale at or before closing.

6. That except for the objection of ICON with respect to the Mesta Grinder which objection is **SUSTAINED,** all other objections to the Sale Motion are due to be, and are hereby, **OVERRULED.**

7. That Trustee's decision to accept the bid of Gadsden Industrial Park, LLC for the Steel Mill Assets is the highest and best bid received by the Trustee was appropriate under the circumstances and meets the "Business Judgment" standard.

8. Nothing in this Order releases or nullifies any liability to a governmental entity under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of this Order. This Order is not intended to prohibit any environmental protection agency from enforcing its regulations in and to any purchaser for future compliance.

9. Further, there appear to be two Uniform Commercial Code UCC–1 forms filed with a lien upon certain property as identified at the Bidding Procedures hearing. The Trustee, at the hearing, stated that said liens had not been addressed specifically and therefore this Court concludes that this sale must be conducted subject to those particular creditor's rights to the collateral.

10. The Clerk is hereby directed to post a copy of this Order on the Clerk's website at www.alnb.uscourts.gov (click on National Interest Cases) pursuant to the General Order previously entered in this case.

11. A copy of this order shall be sent to each of the following (which shall be sufficient service and notice hereof): all parties in interest, and all parties listed on the sign-in sheet for the September 16, 2002 hearing.